# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SLOAN, *et al.*,                          )
                          )
      Plaintiffs,                         )
                          )     **Case Number: 1:06CV00483**
      v.                                      )     **Judge: Ricardo M. Urbina**
                          )
UNITED STATES OF AMERICA,      )
Acting By and Through The INTERNAL  )
REVENUE SERVICE c/o United States   )
Department of Justice,                       )
                          )
      Defendant.                          )
                          )

## MOTION FOR CLASS CERTIFICATION AND
## FOR A PRELIMINARY INJUNCTION

Plaintiffs respectfully move this Court for class certification and for a preliminary injunction. In support of this Motion, Plaintiffs rely upon the attached Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction and in Support of Motion for Class Certification.

Respectfully submitted this 11th day of April, 2006.

By: *Jonathan W. Cuneo*
Jonathan W. Cuneo, Esq. (DC Bar# 939389)
David Stanley, Esq. (DC Bar# 174318)
Charles J. LaDuca, Esq. (DC Bar# 476134)
Steven N. Berk, Esq. (DC Bar # 432870)
William Anderson, Esq.
507 C Street, NE
Washington, DC 20002
Phone: 202-789-3960
Fax: 202-789-1813

Christopher Weld, Jr., Esq.
Kevin Peters, Esq.
TODD & WELD, LLP
28 State Street
Boston, MA 02109

Robert J. Cynkar, Esq. (DC Bar# 957845)
EGAN, FITZPATRICK, MALSCH &
CYNKAR, PLLC
8300 Boone Boulevard, Suite 340
Vienna, VA 22182

Professor Charles Tiefer (DC Bar# 330910)
University of Baltimore
3904 Woodbine Street
Chevy Chase, MD 20815

Henry D. Levine (DC Bar# 952770)
Stephen J. Rosen (DC Bar# 441942)
LEVINE, BLASZAK, BLOCK AND
BOOTHBY, LLP
2001 L Street, NW, Suite 900
Washington, DC 20036

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SLOAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Case Number: 1:06CV00483** |
| v. | ) | **Judge: Ricardo M. Urbina** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Acting By and Through The INTERNAL | ) | |
| REVENUE SERVICE c/o United States | ) | |
| Department of Justice, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Plaintiffs – four residential phone bill payers – brought this suit as representatives of a class of such payers to seek relief from a systematic unlawful exaction. The United States continues to collect from phone bill payers, through their long-distance phone carriers, a "tax" that the D.C. Circuit, among other Circuits, has declared unlawful. Now three Plaintiffs -- Virginia Sloan, Robert McGranahan, and Shari Perlowitz -- seek immediate certification of class under Rule 23(b)(2) and a preliminary injunction against continued collection of that tax from all natural persons in the District of Columbia, Michigan, Ohio, Kentucky, Tennessee, Alabama, Florida and Georgia. These customers reside in states in which the United States Circuit Courts of Appeal have found the tax unlawful -- the District of Columbia, Sixth, and Eleventh Circuits.

The preliminary injunction requested by the Plaintiffs fully satisfies the governing standard for such relief: (1) there is a substantial likelihood Plaintiffs will succeed on the

merits; (2) Plaintiffs will be irreparably injured if an injunction is not granted; (3) the

injunction will not substantially injure the other party; and (4) the public interest will be

furthered by the injunction.  *Serono Laboratories, Inc. v. Shalala,* 158 F.3d 1313, 1317

(D.C.Cir. 1998)(citing *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*

559 F.2d 841, 843 (D.C.Cir.1977)).

The next section addresses the first factor, the merits.  After that, the following

section treats the equities, and with them, why the relief is consistent with the Anti-

Injunction Act.  Thereafter, Plaintiffs discuss the standards for certification of a class

under Federal Rule of Civil Procedure 23(a) and 23(b)(2).

## ARGUMENT

I.    **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF
      THEIR CLAIMS BECAUSE THE PLAIN LANGUAGE OF THE
      STATUTE DOES NOT AUTHORIZE THE "TAX," ALL APPELLATE
      COURTS THAT HAVE CONSIDERED THIS SAME ISSUE HAVE
      HELD AGAINST THE GOVERNMENT, AND THE GOVERNMENT
      HAS CONCEDED FOR MORE THAN A QUARTER CENTURY THAT
      THE "TAXES" COLLECTED ARE NOT AUTHORIZED BY ANY
      STATUTE.**

*When the tax gatherer puts his finger on the citizen,
he must also put his finger on the law permitting it.*

*Leavell v. Blades,* 237 Mo. 695, 141
S.W. 893 (1911), quoted in *OfficeMax,
Inc. v. United States,* 428 F.3d 583, 594
(6th Cir. 2005).

A.    **Historical Background of Telephone Excise Tax.**

The telephone excise tax came into being some 22 years after Alexander Graham

Bell's invention of the telephone.  On April 25, 1898, after the sinking of the battleship

Maine, Congress declared that America and Spain were at war.  The financial expenditures

associated with the war left budget deficits, creating the impetus for the first excise tax on telephone communications. *See* 30 Stat. at 460, Pub. L. No. 55-133 (1898). The tax subsidized the war, and remained in place until its repeal in 1902. Louis Alan Talley, *The Federal Excise Tax on Telephone Service: A History*, 1 (Congressional Research Service 2001), *available at*

http://www.law.umaryland.edu/marshall/crsreports/crsdocuments/RL30553_01042001.pdf (hereinafter "Talley Report").

After the outbreak of World War I, from 1914 to 1916 the telephone tax was re-introduced to offset decreased revenue from corporate income tax and import tariffs, which resulted from instability in Europe created by the war. *Id.* at 2. During and after World War I, from 1917 – 1924, the telephone tax was raised to produce revenue for various expenditures associated with the war. *OfficeMax, Inc. v. United States*, 428 F.3d 583, 585 (6th Cir. 2005), *reh'g denied* ___ F.3d ___ (March 30, 2006)("*Office Max*").

The telephone tax in effect today began during the Great Depression and has been re-authorized 29 times since it was enacted with the Revenue Bill of 1932. Talley Report at 3; 47 Stat. at 270, Pub. L. No. 154 (1932). Initially, the tax was levied only upon long distance calls, but was eventually extended to include local calls also. Talley Report at 3. In 1990 Congress enacted a law making the tax permanent at three percent. *OfficeMax*, 428 F.3d at 586. There was very little change or consideration of the tax in the 1990's. *Id.* However, on September 14, 2000, Congress approved legislation that would have repealed the tax. Talley Report at 7. President Clinton vetoed that legislation for unrelated reasons and the tax has remained in effect since that time. *Id.*

**B.    The Government is Collecting a "Tax" on Services that Fall Outside the Plain Statutory Definition of Services Subject to the Tax.**

Currently, the Government collects a "tax" on long-distance telephone service pursuant to 26 U.S.C. § 4251, which imposes a "3 percent" tax "on amounts paid for communications services," defined to include "toll telephone service." Congress specifically defined the "toll telephone service" subject to the tax to mean:

> (1) a telephonic quality communication for which (A) there is **a toll charge which varies in amount with the distance and** elapsed transmission time of each individual **communication** and (B) the charge is paid within the United States, and
>
> (2) a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total elapses transmission time), to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a specified area which is outside the local telephone system area in which the station provided with this service is located.

26 U.S.C. § 4252(b) (emphasis supplied). The Plaintiffs were charged for long-distance telephone service based solely on "elapsed transmission time" of each call with no variation in charge or accounting of any type for the distance of any call.[1] Declaration of Virginia Sloan, ¶ 3; Declaration of Robert McGranahan, ¶ 3; Declaration of Shari Perlowitz, ¶ 3 ("Sloan Declaration" "McGranahan Declaration" "Perlowitz Declaration").

Only calls charged on the basis of both time and distance are subject to the tax.

*National Railroad Passenger Corp. v. United States*, 431 F.3d 374, 376 (D.C. Cir. 2005)

---

[1] In other cases the IRS has argued unsuccessfully that the services at issue should be considered "local telephone service," as defined by § 4252(a), or WATS-line toll service, as defined by § 4252(b)(2), and thus also subject to the tax on "communications services." Courts have rejected these arguments for the simple reason that the plain language of the statute defines services other than long-distance service, and those other services do not include the service at issue here. The statute defines "local telephone service" as "the access to a local telephone system" (§ 4252(a)(1)) and the WATS-line service as including an "unlimited number" of calls for "a flat amount" (§ 4252(b)(2). The Government's argument has been flatly rejected by courts that have considered it. *See, e.g., OfficeMax*, 428 F.3d at 598-600.

("*NRPC*") ("Subsection (b)(1) imposes a tax <u>only</u> when 'there is a toll charge which varies in amount with the distance <u>and</u> elapsed transmission time of each communication.'") (quoting 26 U.S.C. § 4252(b)(1) (emphasis added). The statute thus imposes a tax on a type of service that the Plaintiffs did not purchase, namely, long distance telephone service where the charge for each call varies by both time and distance. Any "tax" imposed on such services, which are outside the scope of services on which Congress imposed a tax, is *per se* unauthorized. *Crooks v. Harrelson*, 282 U.S. 55, 61 (1930) (tax statutes may not be "extended by implication beyond the clear import of the language used").

Given the plain language of the statute, the Court's inquiry should end here with a ruling in the Plaintiffs' favor. It is axiomatic that federal courts must, wherever possible, look no further than the plain meaning of the language used by Congress in construing statutes. "The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there. Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous."[2] *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (internal quotations, alterations, and citations omitted). Words must be given their plain, ordinary meaning, unless defined otherwise. *Id.* at 183. The word "and" in a statute, which is central to defining the scope of the "tax" at issue in this case, must be presumed to have been used in the ordinary, conjunctive sense unless the context dictates otherwise.

---

[2] The Court may not look to legislative history, administrative interpretations, or other sources where the statutory language is plain and, in any event, such outside sources cannot prevail over the plain terms of the statute. *Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004) (rejecting call to construe statute consistent with legislative history where language of statute produces different, even unintended, result); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) (agency decision cannot deviate from statute's unambiguous meaning).

*Crooks*, 282 U.S. at 58 (construing "and" disjunctively in a tax statute, where nothing in

the context or other provisions warranted anything but ordinary conjunctive use, "would

be to add a material element . . . and thereby to create, not to expound, a provision of

law."). Where, as here, the statute is unambiguous, the Court need not look beyond its

plain terms to find that the Class's long distance services are not subject to the tax.

*NRPC*, 431 F.3d at 376 (holding same statute unambiguous and rejecting Government's

argument that resort to legislative history was needed); *American Bankers Ins. Group. v.*

*United States*, 408 F.3d 1328, 1333 (11th Cir. 2005) (same) (citing *BedRoc Ltd., LLC*, at

183).

### C.    This Circuit and Courts Nationwide that Have Examined this Precise Issue Have Ruled that the "Tax" is Not Authorized.

The claim here does not raise a novel question of law. Indeed, the question of

whether § 4252(b)(1) authorizes an excise tax on long distance telephone service that is

charged only by elapsed time and not also by distance has been litigated repeatedly in a

variety of federal courts. As of today, three U.S. Courts of Appeals, including the Court

of Appeals for the District of Columbia Circuit, have unanimously held that long distance

service charged only on elapsed time is not "toll telephone service" within the scope of §

4252(b)(1), and have ordered refunds of the "tax" wrongfully collected. *See NRPC*, 431

F.3d at 376-379; *OfficeMax*, 428 F.3d at 600; *Am. Bankers Ins. Group*, 408 F.3d at 1331-

37. Several district courts in other federal judicial circuits have also held that taxpayers

are entitled to refunds. *See Hewlett-Packard Co. v. United States*, No. C-04-03832, 2005

WL 1865419, at *2-*5 (N.D. Cal. Aug. 4, 2005) (appeal pending); *Reese Bros., Inc. v.*

*United States*, No. 03-CV-745, 2004 WL 2901579, at *3-*13 (W.D. Pa. Nov. 30, 2004)

(appeal pending); *Fortis, Inc. v. United States*, No. 03 Civ. 5137, 2004 WL 2085528, at

\*5-\*13 (S.D.N.Y. Sept, 16, 2004) (appeal pending).  The United States Court of Claims has also recently found against the Government in two cases.  *See Honeywell, Inc. v. United States*, 64 Fed. Cl. 188, 198-203 (2005) (appeal pending); *America Online, Inc. v. United States*, 64 Fed. Cl. 571, 576-81 (2005) (appeal pending).

Each of these cases resolved the precise issue raised by the Plaintiffs in this case – whether the three percent excise "tax" collected by the Government for long distance service charged on the basis of elapsed time only is unauthorized and, therefore, illegal. Each and every court (except the lower court in *American Bankers Ins. Group*, which was reversed by the Eleventh Circuit) has found in favor of the taxpayer, holding that the "tax" is unauthorized and may not be collected.  Each court rejected the convoluted arguments offered by the Government in support of its continued collection of the unauthorized "tax."  Although the growing number of courts ruling against the Government on this issue provides ample persuasive authority for finding that the Plaintiffs are likely to prevail on their claim, this Court need not look that far.  The Plaintiffs are reasonably likely to prevail on the merits of their claim because the sole legal issue needed to decide the case in favor of the Plaintiffs was resolved in *NRPC*.[3] 431 F.3d at 367 (affirming District Court's holding that, because "Amtrak's charges do not vary by both time and distance," they are not subject to the tax).  Little more can be said except that the Plaintiffs are extremely likely to prevail on the merits of their claim because "the government cannot evade, just as this Court may not fail to follow, precedent from its own court of appeals in a case presenting the same facts and the same

---

[3] Following the *American Bankers Insurance Group* decision, the Government stated that refund claims "will not be processed while there are pending cases in other United States Courts of Appeals," IRS Notice 2005-79, and that it was actively litigating this issue in several other Circuits.  Regardless of the Government's nationwide search for a sympathetic ear, the issue has been resolved in this Circuit.

issues of law." *Le v. U.S. Dep't of State, Bureau of Consular Affairs*, 919 F. Supp. 27, 31 (D.D.C. 1996).

> **D.    The Government Conceded Long Ago that the Excise Tax Statute Did Not Apply to Long Distance Service Charged on the Basis of Elapsed Time Alone.**

More than a quarter century ago, the Government addressed the applicability of § 4252(b)(1) to long distance service that was not charged on the basis of both elapsed time and distance. In Revenue Ruling 79-404, the Government analyzed ship-to-shore telephone service that was charged to users without reference to distance and held that "literally, the service provided in this case does not come within the definition of . . . 'toll telephone service' . . . because the charge for such service does not vary with distance and therefore does not meet the requirement of § 4252(b)(1)." Rev. Rul. 79-404. Nonetheless, the Government decided that the telephone service was "essentially" toll telephone service and telephone companies would have to continue collecting the tax. Acknowledging that, with this ruling, the Government has conceded that the statute does not on its face authorize the tax at issue, the Court in *NRPC* rejected the Government's argument that the ruling was entitled to any deference as an interpretation of Congressional intent:

> What the government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function.

*NRPC*, 431 F.3d at 378, quoting *Iselin v. United States*, 270 U.S. 245, 251 (1926). At the end of the day, the Government has long known and acknowledged that long distance telephone service not charged on the basis of both elapsed time and distance is outside

the scope of § 4252(b)(1). The Government nonetheless continues to force telephone carriers to collect this admittedly unauthorized "tax." This Court should hold the Government to the letter of the law and put an end to this shameful practice.

### E.     The Exaction of this Excise Tax Without Congressional Authorization Violates Due Process.

The process provided by the Constitution for the enactment of taxes arises from "the pivotal point in bringing about the American Revolution," the familiar principle of "no taxation without representation." FORREST MCDONALD, NOVUS ORDO SECLORUM: THE INTELLECTUAL ORIGINS OF THE CONSTITUTION 28 (1985). *See also Texas v. Johnson,* 491 U.S. 397, 435 (1989)(Kennedy, J., concurring) ("The cry of 'no taxation without representation' animated those who revolted against the English Crown to found our Nation – the idea that those who submitted to government should have some say as to what kind of laws were passed."). Accordingly, the Constitution not only requires that Congress enact any measure to exact a tax, *see* U.S. CONST. art. I, § 8, cl. 1, but it further requires that any bill to exact a tax originate in the House of Congress closest to the people – the House of Representatives. *See* U.S. CONST. art. I, § 7, cl.1. At bottom, "[t]axation is a legislative function, and Congress . . . is the sole organ for levying taxes." *National Cable Television Ass'n. v. United States,* 415 U.S. 336, 340 (1974).

As we have demonstrated above, the excise tax at issue has been, and continues to be, exacted from the Plaintiffs and the putative Class by the IRS in the absence of any congressional authorization to do so – an undisputable violation of the clear process commanded by the Constitution. As a result, Plaintiffs have been "deprived of . . . property, without due process of law." U.S. CONST. amend. V.

So clear are these governing principles of law that Plaintiffs have been unable to find any prior case in which the IRS, or any other federal entity, purported to exact tax monies from citizens in the absence of congressional authority, as it has done here. Yet the proposition that unlawful taxes must be returned to those from whom they were exacted has long been understood by the Supreme Court as an obvious element of due process. As the Court put it in a case in which a county had unconstitutionally exacted taxes from a group of Native Americans:

> "[T]he obligation to do justice rests upon all persons, natural and artificial, and if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation." . . . To say that the county could collect these unlawful taxes by coercive means and not incur any obligation to pay them back is nothing short of saying that it could take or appropriate the property of these Indian allottees arbitrarily and without due process of law.

*Ward v. Board of County Comm'rs of Love County,* 253 U.S. 17, 24 (1920). *See also Reich v. Collins,* 513 U.S. 106, 109 (1994) ("[A] denial by a state court of a recovery of taxes exacted in violation of the laws or Constitution of the United States by compulsion is itself in contravention of the Fourteenth Amendment."); *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco*, 495 U.S. 18, 22 (1990) ("[T]he Due Process Clause requires the State to afford taxpayers a meaningful opportunity to secure post payment relief for taxes already paid pursuant to a tax scheme ultimately found unconstitutional.").

**F.    The Exaction of this Excise Tax Without Congressional Authorization Exceeds the Authority of the IRS.**

Equally fundamental is the established rule of law that the IRS, like any other agency of the Executive Branch, has no power to act without congressional authorization. "[I]t is 'central to the real meaning of the rule of law, [and] not particularly controversial'

that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so." *Transohio Savings Bank v. Director, Office of Thrift Supervision,* 967 F.2d 598, 621 (D.C.Cir. 1993) (quoting Edward L. Rubin, *Law and Legislation in the Administrative State,* 89 COLUM.L.REV. 369, 402 (1989)).

      Accordingly, when Congress has not by statute delegated any power to the IRS to impose the excise tax at issue here, the Administrative Procedure Act commands that this Court "shall hold unlawful and set aside [such] agency action . . . in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706 (2)(C). Recourse to the APA is not even needed in such circumstances, as "the case law in this circuit is clear that judicial review is available when an agency acts *ultra vires.*" *Aid Ass'n for Lutherans v. United States Postal Service,* 321 F.3d 1166, 1173 (D.C. Cir. 2003). A proper delegation of authority from Congress is so essential to lawful agency action that, even when another statute nominally precludes judicial review, "[w]hen an executive acts *ultra vires,* courts are normally available to reestablish the limits on his authority." *Id.* (quoting *Dart v. United States,* 848 F.2d 217, 224 (D.C. Cir. 1988). *See also Transohio,* 967 F.2d at 621 ("Agency actions beyond delegated authority are '*ultra vires,*' and courts must invalidate them."); *Griffith v. F.L.R.A.,* 842 F.2d 487, 492 (D.C. Cir. 1988) ("Even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction."); *Motion Picture Ass'n v. Federal Communications Comm'n,* 309 F.3d 796, 801 (D.C. Cir. 2002) (An "agency's interpretation of [a] statute is not entitled to deference absent a *delegation of authority from Congress to regulate in the areas at issue.*") (emphasis in original).

II.   **THE PLAINTIFF CLASS HAS NO OTHER EFFECTIVE RECOURSE BECAUSE THE GOVERNMENT COMPELS THE LONG DISTANCE CARRIERS TO CONTINUE COLLECTING THE TAX, SO THE *WILLIAMS PACKING* STANDARD IS MET AND THE EQUITIES STRONGLY FAVOR SUCH INJUNCTIVE RELIEF.**

A.   **The Binding Nature of Three Circuits' Precedent Means that the Plaintiff Class Meets the Prong of the *Williams Packing* Standard that the Government Cannot Prevail.**

The United States will seek, presumably, to raise the Anti-Injunction Act ("AIA")[4] as a separate barrier against injunctive relief, but the AIA is not a separate barrier in light of the D.C. Circuit's prior ruling against the Government.   That Act provides "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a).  However, the Supreme Court has long recognized an exception to the AIA: (1) "if it is clear that under no circumstance could the Government ultimately prevail" and (2) "equity jurisdiction otherwise exists."  *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962). The *Williams Packing* two-prong standard has been readily satisfied in numerous cases at every level of the federal system.  *See, e.g., C.I.R. v. Shapiro*, 424 U.S. 614 (1976); *Estate of Michael v. M.J. Lullo*, 173 F.2d 503 (4th Cir. 1999); *Ponchik v. Commissioner*, 854 F.2d 1127 (8th Cir. 1988); *Hillyer v. Commissioner*, 817 F. Supp. 532, 537 (M.D. Pa.

---

[4]      At this preliminary stage, the Plaintiffs seek certification of a class for obtaining injunctive relief, without payment of money by the United States.   Accordingly, objections by the United States to types of relief involving payment of money are completely irrelevant on this motion.

1993); *Gardner v. United States*, 211 F.3d 1305, 1310-12 (D.C. Cir. 2000)(taxpayer's injunctive request satisfies AIA; because of the applicability of an AIA express exception, taxpayer only had to meet the second prong of the *Williams Packing* standard).

The first prong, requiring it be "clear that under no circumstance could the Government ultimately prevail," of course is met here, because this Circuit, the Sixth Circuit and the Eleventh Circuit have already decided against the Government, and thereby have bound this Court, as to the unlawfulness of the exaction. Other aspects of the merits may affect the potential remedies, but they do not create any chance that the Government will win, for the Government cannot relitigate the unlawfulness of this tax in this Circuit. As the Ninth Circuit said in a similar situation, once that Circuit had ruled in a "recent decision in *Bond v. United States*, 872 F.2d 898 (9th Cir. 1989), [that the Government's merits position] was erroneous," a taxpayer satisfied this standard for bringing an injunctive case: "We are bound by *Bond* and therefore conclude that 'under no circumstances could the Government ultimately prevail' on the merits. *See Williams Packing*, 370 U.S. at 7." *Lampert v. United States*, 884 F.2d 1395 (Table), (9th Cir. 1989) (emphasis added).

A prior ruling of the D.C. Circuit fully satisfies the first requirement of the *Williams Packing* exception to the AIA, namely, that the Government could not ultimately prevail on the merits question. By applying that first requirement, the Government is "assured of prompt collection of its lawful revenue," while "if it is clear that under no circumstances could the Government ultimately prevail, the central purpose of the Act is inapplicable and . . . the attempted collection may be enjoined if equity jurisdiction otherwise exists." *Williams Packing,* 370 U.S. at 7. "In such a situation the

exaction is merely in 'the guise of a tax.' " *Id.* (quoting *Miller v. Standard Nut Margarine Co.*, 284 U.S. 498, 509 (1932)).

As to the other prong of the *Williams Packing* exception to the AIA, the requirement that "equity jurisdiction otherwise exists" is satisfied by the showing otherwise needed for injunctive relief. *See, e.g., C.I.R. v. Shapiro*, 424 U.S. at 627; *O'Hagan v. United States,* 86 F.3d 776, 783 (8th Cir. 1996). Accordingly, this memorandum will treat the equities and the second prong of *Williams Packing* together.

### B.     The Plaintiff Class Will Suffer Irreparable Injury Because there is No Alternative Remedy for this Wrongful Exaction from a Large Group.

For the Plaintiffs and putative Class, there is no adequate alternative remedy, and they will suffer irreparable injury absent an injunction. This is a class of millions of phone users, from whom hundreds of millions of dollars have been and are being collected. About the Communications Excise Tax provision, a Senate report wrote in 2000, "[i]t is estimated that [a repeal would] affect approximately 93 million households and approximately 23 million business service customers," involving payments of $24 billion over a five-year period.[5] That scale of injury merits injunctive relief. As the Senate Committee on Finance commented in 2000, in a report supporting repeal of the phone tax,[6] "[t]oday telephone service is not a luxury, but a necessity. As such, the burden of the excise tax on telephone service is regressive."

---

[5]  *Repeal of Federal Communications Excise Tax:*  S. Rep. No. 328, 106th Cong., 2d Sess. 10 (2000).
[6] The repeal measure was passed by the House and Senate but was part of a larger tax measure vetoed on independent grounds by the President. While there were evident differences about larger issues of the budget, the veto did not involve any disagreement over the essential nature of this tax -- that it is a regressive tax on something today more a necessity than a luxury. Specifically, the Administration agreed – by a letter from Treasury Secretary Lawrence H. Summers – that phasing out the phone tax was a "worthy policy objective" because "it is economically inefficient" and regressive.   This is cited, not, of course, to put a tax policy question before this Court, but for the context of how widely accepted it is, that the tax does in fact produce such injury.

Furthermore, no administrative mechanism provides an adequate remedy at law that might be available in other contexts, as is the case with federal income or FUTA taxes. *See, e.g., Alexander v. "Americans United,"* 416 U.S. 752 (1974); *Bob Jones University v. Simon*, 416 U.S. 725 (1974); *Foodservice and Lodging Institute v. Regan*, 809 F.2d 842, 845 (D.C. Cir. 1987)(no relief via *Williams Packing* because "alternative remedies are available").  For example, ordinary income taxpayers have an adequate remedy at law (concerning disputed income taxes) when they file their ordinary, self-controlled income tax return, Form 1040 (or its equivalent).  If the IRS handled the phone tax on Form 1040,[7] the 93 million phone users would have the remedy, in line with the rulings against the phone tax, of simply claiming a zero liability for the phone tax on that Form 1040 line, and commensurately reduce their total payment due for the whole of their Form 1040 tax return liability.  If the IRS decided to challenge these millions of taxpayers for following the rule of law established by the Circuit courts, the IRS would have to recalculate all of their Form 1040s and make available to each of them an administrative process to hear their identical – and correct – claims concerning their failure to pay this illegal tax.

However, the collection of excise taxes differs radically from the collection of income taxes.  For example, buyers of gasoline leave the pump having paid a federal excise tax on the purchased gasoline without having filed an excise tax return.  Rather, the IRS requires those selling gasoline – just as the IRS requires the long distance phone carriers – to collect the tax from individual payers.  The long-distance phone carriers are the tax collectors.  As the IRS manual states, "The collector files the Form 720" – an

---

[7] This would be if the phone tax were one of the "other taxes" of Form 1040 lines 57-62 (like the FICA tax on tip income of line 58).

aggregate return, the Federal Excise Tax Return, Form 720, adding up the figures for the millions of individual taxpayers – and "[t]here is no requirement for a return to be filed by the actual taxpayer." *Internal Revenue Manual*, § 4.24.8.2 (2003) on "Direct Assessment." (Westlaw, IRM database, IRM 4.24.4.8.2).

###     1.     Schedule C of Form 720

Significantly, the IRS has created a schedule, Schedule C of Form 720, to deal with tax claims by the carriers, but not for the individuals actually paying the phone tax. The IRS has done so in obedience to Congress's command, in 26 U.S.C. § 6415, "Credits or refunds to persons who collected certain taxes," to allow the collectors of the phone excise tax to seek credits or refunds. Accordingly, the IRS deems the Federal Excise Tax Return, Form 720 Schedule C, the main remedy for Communications Excise Tax refund claims. [8] In its manual, the IRS says of the phone tax that, "**Generally**, instead of claiming a refund, claims may be made on Schedule C of Form 720 as a credit against excise tax liability."[9]

If the Plaintiffs and the putative Class itself had the power of control over the tax return, Form 720 Schedule C, they might have an adequate remedy to obtain full classwide relief, but this avenue of relief is not open to the millions of individual phone excise taxpayers. Compounding the need for an injunction, the IRS has instructed the carriers that they must keep collecting the illegal phone tax, so that the carriers themselves could not use their Form 720 Schedule C's to provide the Plaintiffs and the

---

[8] The use of Form 720 is discussed in the Internal Revenue Manual, subsection 3.17.41.9 (Oct. 1, 2005) – "Purpose, Authority and Requirements for Monitoring Trust Fund Excise Taxes," IRM 3.17.41.9.38 (Westlaw Database FTX-ALL). As the manual notes, "Some of the reasons for the over reporting of taxes for prior quarters are: . . . Repeal of a tax . . . . Reduction in the rate of the tax . . . . Exemption. . . . Expiration . . . ."

[9] Internal Revenue Manual, Subsection 4.24.8.2 (2003) – "Types of Claims and Characteristics," in Chapter 4.24, "Excise Tax Handbook," (Westlaw Database FTX-ALL)(emphasis added).

putative Class with any relief. The IRS has ordered, "Persons paying for taxable communications services (taxpayers) are required to pay the tax to a collecting agent (the person receiving the payment on which tax is imposed), and collecting agents are required to pay over the tax to the United States Treasury and to file the required returns." *Communications Excise Tax; Section 4251,* Notice 2005-79, 2005 WL 2671273 (Nov. 14, 2005)(in the Westlaw "IRS NOT" database)(emphasis added). The IRS has thus commanded that, in disregard of the D.C. Circuit and other appellate rulings against this tax, individual "(taxpayers) are required to pay the tax," to the long-distance carriers who are the "collecting agent[s]" (the person receiving the payment on which tax is imposed), and these long distance carriers, as "collecting agents are required to pay over the tax to the United States Treasury." And if such carriers "fail[ed] during prior reporting periods to collect taxes due, the Commissioner may assert those taxes directly against" the carriers. 26 C.F.R. § 49.4291-1. Rather than allowing carriers to seek relief from the tax on behalf of individual taxpayers, the IRS has threatened the carriers with direct liability for billions of dollars in taxes if they stop collecting the "tax" or seek a credit for taxes unlawfully collected.

In Notice 2005-79, the IRS acknowledged that "[t]he government's recent loss in *American Bankers Ins. Group v. United States*, 408 F.3d 1328 (11th Cir. 2005), *rev'g* 308 F.Supp.2d 1360 (S.D. Fla. 2004), has caused some to question the continued applicability of the Communications Excise Tax imposed by § 4251 of the Internal Revenue Code." 2005 WL 2671273 (pub. Nov. 14, 2005)(Westlaw IRS NOT database). Nevertheless, the IRS intransigently declared that "[t]his notice confirms that the Service will continue to assess and collect the tax . . . . Collectors should continue to collect the tax, including

from taxpayers within the jurisdiction of the United States Court of Appeals for the Eleventh Circuit." *Id.*

The Supreme Court has underscored the availability of injunctive relief to those who, like this Plaintiffs and the putative Class, seek an exception from the AIA due to their lack of control over the third party who files the relevant tax return. In *South Carolina v. Regan*, the state of South Carolina applied for injunctive relief against the federal Treasury Secretary's tax treatment of the state's debts. 465 U.S. 367 (1984). Seeking dismissal, the Justice Department argued that South Carolina could have, and therefore should have, waited for the state's creditors – that is the individual taxpayers, who had to comply with the federal policy on their Form 1040s – to challenge the disputed tax treatment. The Supreme Court disagreed. "Congress did not intend the Act to apply where an aggrieved party would be required to depend on the mere possibility of persuading a third party to assert his claims." *Id.* at 37-78.[10] Furthermore, equity supported injunctive relief when "enforcement will cause irreparable harm or lead to a multiplicity of suits." *Id.* at 381 n.19. In short, *South Carolina v. Regan* confirms that the Plaintiffs and the putative Class should not be barred from injunctive relief in the vain hope of "persuading a third party," the carrier, "to assert his claim" on a return controlled only by the carrier. And, injunctive relief is also needed here to avoid "a multiplicity of suits."

---

[10] Although the Tax Injunction Act regarding federal court injunctions against collection of state taxes is worded a little differently, in many core aspects, including this, it works similarly to the AIA. Banks have successfully sought an injunction on a tax on their certificates of deposits because the banks would otherwise have had to persuade the filers of the relevant tax returns to make the challenge. *See Dominion National Bank v. Olsen*, 771 F.2d 108, 115 (6th Cir. 1985).

### 2.    Form 8849

Another potential, but effectively unavailable, avenue of administrative relief is the IRS's Form 8849, the general form by which taxpayers may seek an excise tax refund.[11]  The IRS has blocked this avenue by imposing a general ban on processing *any* refunds related to the excise tax at issue here.  *See Communications Excise Tax; Section 4251,* Notice 2005-79, 2005 WL 2671273 (pub. Nov. 14, 2005)(Westlaw IRS NOT database) (While taxpayers may "fil[e] administrative claims for refund with the Service," such "[t]axpayers are advised, however, that these claims, including claims for which appellate venue would lie in the United States Court of Appeals for the Eleventh Circuit, will not be processed while there are pending cases in other United States Courts of Appeals.") (emphasis added).

Even if the IRS had not created its own barriers to relief, in truth Form 8849 does not provide a realistic remedy.  The form is designed for individual taxpayers who know the specifics of how much they paid and can make a specific demand for repayment.  Form 8849 is utterly useless here, where millions of taxpayers are unaware that the

---

[11] The IRS itself has acknowledged the shortcoming of Form 8849 as an option here, commanding that "generally" the remedy is the Federal Excise Tax Return, Form 720.  Notably, the IRS manual's section, describing its specialists on the phone tax, discusses only the Form 720 filed by the carriers ("The tax is reported on Form 720"), and does not even mention the Form 8849, further demonstrating which form is relevant here.  *Internal Revenue Manual,* section 4.24.6.4.3.3 in "Excise Tax Handbook" on "Communications Tax" (2003)(Westlaw, IRM database, at IRM-AA § 4.24.6.4.3.3).  Other IRS manual sections do mention Form 8849, but these do not suggest that Form 8849, rather than Form 720 Schedule C, can be a vehicle for relief regarding the telephone excise tax.  Basically, once the IRS decided "the excess adjustments and claims reported on Form 720, Part III, line 4 can exceed the liability reported on line 3," i.e., even a claim large enough that it exceeded liability could go on Form 720, the IRS advised "it will no longer be necessary to file Form 8849. . . ."  *Excise Tax Changes,* I.R.S. Announcement 94-140, 1994-50 I.R.B. 22, 1994 WL 6876-25 (Westlaw, database "IRS ANN")(reprinted in 65 Tax Notes 1488 (Dec. 19, 1994)(Lexis, database for Tax Analysts Tax Notes Weekly)).

The IRS also indicates that Form 720 is used "in lieu of filing a Form 8849."  "Form 720, Schedule C, is used to report adjustments to previously-reported liabilities and claims unrelated to liabilities in lieu of filing a Form 8849, Claim for Refund of Excise Taxes."  *Internal Revenue Manual,* "Form 720 Reporting Requirements," § 20.1.4.8 (2005)(Westlaw, IRM database, at IRM 20.1.4.8)(underlining added).  Hence, Form 8849 itself carries this message: "**Caution: *Do not use* Form 8849 to make adjustments to liability reported on Forms 720 for prior quarters or to claim any amounts that were or will be claimed on *Schedule C (Form 720), Claims . . . . "** Form 8849 (Feb. 2005)(bolding and italics in original).

Government has been unlawfully taking their money, and, even if they became aware of that unlawful exaction, would in all likelihood not proceed individually due to the small amounts at stake for each taxpayer. To say that Form 8849 is an adequate remedy at law is a prescription for continued lawlessness and injustice – only large taxpayers would have the ability to secure a refund, and, as we have seen, the refunds due to such taxpayers do not provide enough of an incentive for the Government to halt the collection of this unlawful tax. A ruling upholding Form 8849 as an adequate remedy at law in the circumstances of this case would be tantamount to prohibiting the use of the class action device by the putative Class here. That would amount to an *ad hoc* repeal of Rule 23, that was not authorized by Congress, and is not within the authority of the IRS.

Even if Form 8849 could be used by members of the putative Class here, that would not produce a result that would make sense from the perspective of judicial economy or efficiency. That approach would bury this Court, and all other district courts, in a tidal wave of cases too small and too identical to be a sensible workload for the most patient and thrifty small claims court in the land. *See Javor v. State Board of Equalization*, 527 P.2d 1153, 1155 (Cal. 1974)(approving a class action by 500,000 automobile purchasers to recover a federal excise tax paid over to the automobile sellers, since any other procedure "would be too great a burden on each individual plaintiff in view of the [limited] amount claimed by each"). Indeed, it is well established that payers of a federal excise tax satisfy the *Williams Packing* equitable standard by the showing that, absent access to a single injunctive proceeding, they must pursue "what would otherwise be considered negligible amounts of tax" in multiple proceedings with "great expense involved" in "both time and money" for "prosecuting" more than one of "such

procedures." *Trinity United Methodist Church v. United States*, 1975 WL 613 (N.D. Ala. Jan. 16, 1975), at *4 (quote omitted)(granting a school a preliminary injunction against an excise tax on its bus-related purchases); *see Hemmings v. United States*, 842 F. Supp. 935, 937 (S.D. Tex. 1993)(*Williams Packing* equitable standard is met for injunctive relief "to avoid duplication of proceedings").

### C.     There is No Substantial Harm to the Defendant.

The Government will not experience any substantial harm because, pursuant to the D.C. Circuit precedent, it has no legal right to continue to receive this exaction from the Plaintiffs and putative Class. *Williams Packing* makes clear that when, as in this case, the United States has no argument for legitimately continuing to collect the tax, it is not harmed by an injunction:

> The manifest purpose of sec. 7421(a) is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund. In this manner the United States is assured of prompt collection of its <u>lawful</u> revenue. Nevertheless, <u>if it is clear that under no circumstances could the Government ultimately prevail, the central purpose of the Act is inapplicable and</u>, under the *Nut Margarine* case, <u>the attempted collection may be enjoined</u> if equity jurisdiction otherwise exists. In such a situation the exaction is merely in 'the guise of a tax.' *Id.*, [284 U.S.] at 509.

*Williams Packing*, *supra*, 370 U.S. at 7 (footnote omitted, emphasis added).

While the IRS may complain of harm to its orderly efforts to collect taxes, *Williams Packing* says that this concern has already received its full due when the Court decides whether, under any circumstances, the Government can prevail on the validity of a tax. Under binding D.C. Circuit precedent, this question is closed: the IRS lacks the legitimate right to collect this tax from Plaintiffs and the putative Class. Period. To put it

differently, the IRS should never have issued Notice 2005-79 defying the D.C. Circuit, but should have halted collection of the tax and looked for ways to build on the existing mechanism of Form 720 Schedule C to give taxpayers the refund to which they are entitled. Accordingly, commanding the IRS to respect the taxpayers' rights, as unequivocally confirmed by the D.C. Circuit, cannot as a matter of law harm any legitimate interest of the Government.

### D.    The Public Interest Strongly Favors This Injunction.

Several elements contribute to the public interest strongly favoring this injunction. When the United States merely shrugs at a series of uniform federal appellate rulings against the validity of this tax, it imposes heavily upon a large taxpaying population. It is particularly unfair that only large businesses can afford what it takes to obtain a ruling that secures refunds of this tax, while the IRS denies the millions of individual taxpayers any effective means of redress. The IRS thereby imposes not merely upon a large taxpaying population, but specifically upon the portion of that population which can least afford to invoke their indisputable rights. As previously quoted, the Senate Committee on Finance noted in 2000, this is a "regressive" tax on what is today much more of a necessity than a luxury. Nothing could be less in the public interest than this exaction from upon millions of honest taxpaying individuals, falling unfairly and regressively upon those who can least afford to claim their rights.

Moreover, it flouts a fundamental tradition of Anglo-American constitutional democracy to force the population to pay an exaction not legitimately authorized by the legislature. As the Complaint cites, several great precedents reflect the bedrock principles that such exactions cannot be excused and perpetuated by their limited absolute

size for many individuals – overlooking how that is multiplied when applied to the whole population. The three-penny tax on tea by the British, which led to the Boston Tea Party and became immortalized in a provision of the Declaration of Independence, exemplifies the tradition that the public must not be obliged to pay an illegal and illegitimate exaction of three pennies, three percent, or any amount. It is not in the public interest to deny the public a means to proceed with a class action for injunctive relief to deal with this kind of illegal exaction.

There is nothing unusual in taking into account that the procedures followed must suit the situation of 93 million taxpayers. *See United States v. Brockamp*, 519 U.S. 347, 352 (1997)(in determining whether equitable tolling applies to tax refunds, Court noted that the IRS processes over 200 million returns and issues 90 million refunds each year); *Stone Container Corp. v. United States*, 229 F.3d 1345, 1353 (Fed. Cir. 2000)(same). These millions of members of the putative Class have rights confirmed by this Circuit, in accord with what other Circuits have uniformly held. The IRS has chosen to put these millions of people in a position where they will only have these rights if this Court issues a preliminary injunction. It is in the public interest for the Court to do so.

## III.    THIS CASE SATISFIES THE REQUIREMENTS OF RULE 23.

### A.    Numerosity: The class is so numerous that joinder is impracticable.

Rule 23(a)(1) requires that the Class be so numerous that joinder of all class members is impracticable. "There is no specific threshold that must be surpassed in order to satisfy the numerosity requirement." *Does v. District of Columbia*, 232 F.R.D. 18, 25

(D.D.C. 2005). Rather, Courts must determine, "whether the number of plaintiffs is so large that using the class action mechanism would serve the interests of judicial economy and efficiency." *Freeport Partners v. Allbritton*, 2006 U.S. Dist. LEXIS 9710, *16 (D.D.C. 2006). A class of at least 40 members has been found adequate to satisfy the numerosity requirement. *Does v. District of Columbia*, 232 F.R.D. at 26 (internal citations omitted).

Here the putative Class consists of literally millions of members spread throughout the United States. Second, while the vast majority of the putative Class members are unknown to counsel, they certainly exist, and thus difficulties of joinder are compounded further. Third, the relatively small claims pressed by individual putative Class members strongly suggest that many putative Class members would never initiate their own action or seek to join this action. Joinder is impracticable. In sum, Rule 23(a)(1) is satisfied because the sheer size and geographic dispersion of the proposed class coupled with the relatively small size of individual claims makes joinder impracticable.


**B.    Commonality: There are numerous questions of law and fact common to the class.**

The commonality requirement of Rule 23(a)(2) is satisfied whenever common questions of law or fact are alleged. The threshold for commonality is not high. Rather, as this Court has explained, "the commonality test is met when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Id.* at 25 (internal quotations omitted). Because the requirements may be

satisfied by a single common issue, it is "easily met."  *In re Vitamins Antitrust Litig.*, 209

F.R.D. 251, 259 (D.D.C. 2002).

Here, commonality is established easily.  Indeed, a single trial will resolve certain

central issues at the heart of every class member's claims, including:

(i)     Whether the Government is authorized to collect taxes on toll telephone

        services that were not, and are not, billed on a time and distance basis;

(ii)    Whether the Government was and is legally entitled to require collection

        of this alleged excise tax by long distance carriers;

(iii)   Whether the Government repaid any of the excise tax illegally collected to

        taxpayers;

(iv)    Whether the Government's imposition of this tax without Congressional

        authorization deprives Plaintiffs of their property without due process of

        law in violation of the Fifth Amendment to the United States Constitution;

(v)     Whether the collection of the illegal tax constitutes a taking of property

        without just compensation in violation of the Fifth Amendment to the

        United States Constitution;

(vi)    Whether the continued collection of the unauthorized and illegal excise tax

        constitutes a violation of the Fifth Amendment of the United States

        Constitution that should be enjoined as it is clear that under no

        circumstances will the United States ultimately prevail in its position that

        the tax is authorized.

These issues and other similar issues underlie every claim, are common to all

Plaintiffs and putative Class members, and arise from the IRS's common course of action

regarding the imposition of the excise tax. Accordingly, the commonality requirement of Rule 23(a)(2) is satisfied.

**C.      Typicality: Plaintiffs' claims are typical of the putative Class' claims.**

In summarizing the relationship between all of the requirements under Rule 23(a), leading commentators on class actions note:

> The first two prerequisites of Rule 23, joinder impracticality and common questions, focus on the characteristics of the class. Taken as a unit, they form the core of the class-action concept. The second two prerequisites, typicality and adequacy of representation, focus instead on the desired characteristics of the class representative.

NEWBERG ON CLASS ACTIONS, § 3:13, at 316-17 (4th ed. 2002). Thus, with the discussion of typicality, the focus of Plaintiffs' discussion will change from being centered on the IRS and the putative Class to one that delves into the named Plaintiffs, their claims, and their counsel.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Typicality is satisfied in a case if, "each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liaibility." *Pigford v. Glickman*, 182 F.R.D. 341, 349 (D.D.C. 1998) (internal citiations omitted).

Here, Plaintiffs' claims are not simply typical of absent putative Class member claims, they are identical. While the amounts wrongfully taken may vary from individual to individual, the wrongful conduct is the same, namely, the imposition of an excise tax

that was not actually applicable. Plaintiffs assert that there is a more than sufficient nexus between Plaintiffs and absent putative Class members to meet the requirements of typicality where, as here, the claims of the putative Class and the putative Class representatives arise from the same course of events and liability would be predicated on the same or similar legal arguments. Indeed, the claims that Plaintiffs seek to present are the legal claims that arise from the IRS's decision to collect the Communications Excise Tax despite the fact that it had no legal basis to do so.

Plaintiffs' claims are typical of the putative Class members' claims, and therefore satisfy Rule 23(a)(3).

**D.     Adequacy: Plaintiffs will fairly and adequately protect the interests of all class members and have retained experienced and competent class counsel.**

Rule 23(a)(4) requires that the named Plaintiffs fairly and adequately protect the interests of the class. There are two prongs to this requirement: (i) Plaintiffs must have common interests with the putative Class members; and (ii) Plaintiffs must vigorously prosecute the interests of the putative Class through qualified counsel. *Sosna v. Iowa,* 419 U.S. 393, 416 (1975). This adequacy inquiry must necessarily contemplate, "the adequacy of representation, including the quality of counsel, any disparity of interest between class representatives and members of the class, communication between class counsel and the class and the overall context of the litigation." *Does v. District of Columbia,* 232 F.R.D. at 28.

Here, as previously discussed, Plaintiffs have common interests with the unnamed putative Class members. Plaintiffs seek a declaration from this Court that the collection of the excise tax at issue has been and is illegal. Further, Plaintiffs and putative Class

members seek corresponding injunctive relief to prevent the Government from illegally collecting the excise tax in the future.  Finally, Plaintiffs seek an accounting and subsequently the return of all money illegally collected.  Plaintiffs have no interests that are antagonistic to the interests of absent putative Class members.

The second prong is also satisfied, as Plaintiffs have retained qualified counsel with extensive experience in representing plaintiffs in complex, class action and federal litigation.  *See* materials relating to Cuneo Gilbert & LaDuca, LLP; Todd & Weld, LLP; Egan Fitzpatrick, Malsch & Cynkar, PLLC; and Professor Charles Tiefer; Levine, Blaszak, Block and Boothby, LLP, Exhibits A-E.

Appointment of the aforementioned attorneys as counsel in this case is also appropriate pursuant to Fed. R. Civ. P. 23(g).  Class Counsel will fairly and adequately represent the claims of the class.  Class Counsel have already committed significant time and resources into the investigation and development of this action.  As the firm resumes reflect, Class Counsel have extensive experience in nationwide class actions and cases of wide scope and great complexity.  Class Counsel have the expertise and resources necessary to adequately represent the Class and serve as Class Counsel.  Thus, the requirements of both Rule 23(g) and Rule 23(a)(4) are met.

### E.     Plaintiffs' claims satisfy Rule 23(b)(2).

In addition to satisfying the requirements of Rule 23(a), Plaintiffs must fulfill the requirements of one of the subdivisions of Rule 23(b).  Because Plaintiffs request injunctive and declaratory relief, Plaintiffs seek to maintain class certification under Rule 23(b)(2).

Under Rule 23(b)(2), an action may be maintained as a class action if:

> the party opposing the class has acted or refused to act on
> grounds generally applicable to the class, thereby making
> appropriate final injunctive relief or corresponding
> declaratory relief with respect to the class as a whole . . . .

Plaintiffs have alleged that the IRS has been and is on notice that the collection of the tax was illegal, yet they have continued to collect it. Despite numerous Federal court cases declaring the tax illegal, the IRS continues to levy the tax. Thus, the IRS refuses to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief and/or corresponding declaratory relief with respect to the putative Class as a whole. Accordingly, the Court may properly certify the injunctive relief aspects of the putative Class members' clams under (b)(2).

Plaintiffs respectfully submit that notice is not appropriate in this case, as it is filed under Rule 23(b)(2). While Rule 23(c)(2) provides that class members are entitled to notice in an action brought under Rule 23(b)(3), Rule 23 makes no analogous provision for cases brought under (b)(1) or (b)(2). *Eubanks v. Billington*, 324 U.S. App. D.C. 41, 92 (D.C. Cir. 1997). The decision whether to require notice in a Rule 23(b)(2) action rests in the discretion of the trial court. *Pate v. United States*, 328 F. Supp. 2d 62, 70 (D.D.C. 2004) (Internal citations omitted). In *Woodward v. Rogers*, this Court discussed the factors pertinent to notice in a (b)(2) action when it stated, "in the particular circumstances of this case ... where the adequacy of the representation of the class interests by the named parties is clear, where no apparent purpose would by served by notice to this wide-ranging class even if notice were at all practicable ... the essential requisites of due process have been met without further notice." 344 F. Supp. 974, 980 (D.D.C. 1972). *Does v. District of Columbia*, also supports this position when it notes that the "advisory notes to the 2003 amendments to *Rule 23* state that 'the authority to

direct notice to class members in a (b)(1) or (b)(2) class action should be exercised with care' in light of the costs associated with giving notice...." 232 F.R.D. at 38 n. 17.

In this case, the named Plaintiffs provide more than adequate representation to the putative Class members' interests and there is no apparent purpose for requiring notice. The Plaintiffs in this case seek exactly what any putative Class member would, an injunction ceasing the wrongful imposition of the Communications Excise Tax and the return of all funds illegally collected. Furthermore, the sheer number of individuals at issue makes notice not only impracticable, but also inefficient, as individual claims will typically be quite small and the cost of contacting all putative Class members would be enormous and unjustified. In short, the pertinent case law in the D.C. Circuit, when coupled with the relevant advisory committee notes on Rule 23 and common sense, militate against requiring notice in this action.

## CONCLUSION

Wherefore, for all the foregoing reasons and any that may be advanced at a hearing on the Motion, Plaintiffs respectfully submit that their Motion for Class Certification and for a Preliminary Injunction should be granted.

DATED: April 11, 2006.

CUNEO GILBERT & LADUCA, LLP

By: _____
Jonathan W. Cuneo, Esq. (DC Bar# 939389)
David Stanley, Esq. (DC Bar# 174318)
Charles J. LaDuca, Esq. (DC Bar# 476134)
Steven N. Berk, Esq. (DC Bar #432870)
William Anderson, Esq.
507 C Street, NE
Washington, DC 20002
Phone: 202-789-3960
Fax: 202-789-1813

Christopher Weld, Jr., Esq.
Kevin Peters, Esq.
TODD & WELD, LLP
28 State Street
Boston, MA 02109

Robert J. Cynkar, Esq. (DC Bar# 957845)
EGAN, FITZPATRICK, MALSCH &
CYNKAR, PLLC
8300 Boone Boulevard, Suite 340
Vienna, VA 22182

Professor Charles Tiefer (DC Bar# 330910)
University of Baltimore
3904 Woodbine Street
Chevy Chase, MD 20815

Henry D. Levine (DC Bar# 952770)
Stephen J. Rosen (DC Bar# 441942)
LEVINE, BLASZAK, BLOCK AND
BOOTHBY, LLP
2001 L Street, NW, Suite 900
Washington, DC 20036