## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VIRGINIA SLOAN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )Civil Action No.: 1:06-cv-00483 RMU |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs respectfully move this Court for a preliminary injunction. Plaintiffs rely

upon the attached Memorandum of Points and Authorities in Support of Plaintiffs'

Motion for Preliminary Injunction.

DATED: _July 6, 2006_.

CUNEO GILBERT & LADUCA, LLP

By: _Jonathan W. Cuneo_

Jonathan W. Cuneo, Esquire (DC Bar# 939389)
Charles J. LaDuca, Esquire  (DC Bar# 476134)
William H. Anderson, Esquire
507 C Street, NE
Washington, DC 20002
(202) 789-3960

Nicholas E. Chimicles, Esquire
(admitted pro hac vice)
Benjamin F. Johns, Esquire
(admitted pro hac vice)
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
(610) 642-8500

Robert J. Cynkar, Esquire  (DC Bar# 957845)
EGAN, FITZPATRICK, MALSCH & CYNKAR,
   PLLC
8300 Boone Boulevard, Suite 340
Vienna, VA  22182
(703) 891-4050

Henry D. Levine, Esquire (DC Bar # 952770)
Stephen J. Rosen, Esquire (DC Bar # 441942)
LEVINE, BLASZAK, BLOCK AND
   BOOTHBY, LLC
2001 L Street, NW, Suite 900
Washington, D.C.  20036

R. Montgomery Donaldson, Esquire
MONTGOMERY, McCRACKEN, WALKER
   & RHOADS, LLP
300 Delaware Avenue, Suite 750
Wilmington, Delaware  19801
(302) 504-7800

Stephen A. Madva, Esquire
Clifford Scott Meyer, Esquire
MONTGOMERY, McCRACKEN, WALKER
   & RHOADS, LLP
123 South Broad Street
Philadelphia, PA 19109-1030
(215) 772-1500

Christopher Weld, Jr., Esquire
(admitted pro hac vice)
Kevin T. Peters, Esquire
(admitted pro hac vice)
TODD & WELD LLP
28 State Street
Boston, MA  02109
(617) 720-2626

Professor Charles Tiefer  (DC Bar#  330910)
University of Baltimore
3904 Woodbine Street
Chevy Chase, MD  20815
(301) 951-4239

Andrew N. Friedman, Esquire
(D.C. Bar No. 375595)
Victoria S. Nugent, Esquire
(D.C. Bar No. 470800)
COHEN, MILSTEIN, HAUSFELD & TOLL,
    P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
(202) 408-4600

David L. Wales, Esquire (Bar No. 417440)
Mark C. Rifkin, Esquire
Martin Restituyo, Esquire
WOLF HALDENSTEIN ADLER FREEMAN
    & HERZ LLP
270 Madison Avenue
New York, New York 10016
(212) 545-4600

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VIRGINIA SLOAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: 1:06-cv-00483 RMU |
| v. | ) | |
| | ) | Oral Argument / Evidentiary Hearing |
| UNITED STATES, | ) | Requested |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION AND SUMMARY

Plaintiffs, on behalf of themselves and others similarly situated, brought this action to obtain the return of billions of dollars illegally collected by the Government for many years through the unlawful imposition of a three percent federal excise tax on toll telephone calls (the "FET") that was not authorized by Congress. The Internal Revenue Service (the "I.R.S.," "Defendant," and/or "Government") exacted this money by requiring telephone companies to add a 3% charge to every subscriber's long distance and wireless telephone bills. The I.R.S. persisted in this illegal action in the face of intense criticism – validated in a series of federal court decisions – that the "tax" was being collected in a manner that violated the applicable statute and was therefore unlawful.

Two months after this case was filed – with motions for a preliminary injunction and class certification pending, and in the face of decisions by five United States Courts of Appeal declaring the FET illegal – the I.R.S. issued Notice 2006-50 (the "Notice"). In

the Notice the Government finally conceded the invalidity of the "tax," but established a deeply flawed and incomplete framework for the return of only part of the funds that it had been wrongfully collecting for almost a decade. In sum, the Notice has significantly changed the issues in this case and shifted its focus to the actions taken in that Notice. This motion seeks preliminary relief with respect to only some of those actions.[1]

Secretly drafted behind closed doors, and abruptly issued without advance public notice or consultation with affected taxpayers, the Notice took back with one hand what it purported to give with the other, announcing steps that compounded years of wrongful FET collection by effectively denying millions of taxpayers the refunds to which the Government now agrees they are entitled. The Notice establishes a procedure that will not return anything close to the full amount of the wrongfully collected fund, assuring that the Treasury Department will pocket billions in unlawfully accumulated revenue. The substantial windfall that the Notice will provide to the Government reflects basic demographic choices that work to the particular disadvantage of the most weak and vulnerable victims of the FET – Americans who do not file tax returns (because their taxable income is below the filing threshold), small businesses, and small nonprofit

---

[1] One of the more profoundly unlawful aspects of the Notice to be addressed later in this litigation is the I.R.S.'s refusal to return more than the most recent three years and four months worth of collections that were added to this fund, when the exaction of this money became illegal more than six years ago. The Government cannot illegally take its citizens' property and then simply by an executive "notice" refuse to make them whole. To the contrary, under bedrock constitutional principles the Government must pay such citizens *more* than was exacted – that is, pay them interest – in order to make them whole. *See Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984) (A citizen whose property is taken "is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation."); *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304 (1923) ("[T]he owner shall be put in as good position pecuniarily as he would have been if his property had not been taken."). *See also Ward v. Board of County Comm'rs*, 253 U.S. 17, 24 (1920) ("To say that the county could collect these unlawful taxes by coercive means and not incur any obligation to pay them back is nothing short of saying that it could take or appropriate the property of these [taxpayers] arbitrarily and without due process of law.").

organizations. The choice clearly made by the Government in this Notice is to further disadvantage these already disadvantaged groups.

The root of the problem is that the I.R.S. proposes to make <u>excise</u> tax refunds solely available through credits on <u>income</u> tax returns,[2] which are entirely unrelated to the FET. Tying excise tax refunds to income tax returns will effectively deny these refunds to individuals and entities that do not file income tax returns ("non-filers"). Non-filers are comprised primarily of low-income individuals (more than twelve million of them senior citizens) and approximately one million small nonprofit organizations – charities, churches, research institutes, clinics, veterans' organizations, and the like.

The Notice announced that a "safe harbor" or "standard" refund amount will be available to individual taxpayers without the need for documentation. Because the I.R.S. has not announced the "safe harbor" amount, it remains to be seen whether that amount will be sufficient.[3] Regardless of its sufficiency for individual taxpayers, the I.R.S. already has announced that the safe harbor will not be available to "entities."[4] The I.R.S. plan instead imposes documentation requirements for refunds to any and all entities, including small businesses and nonprofits whose refunds (generally less than $200, and in most cases substantially less than that) will not justify the many hours required to assemble and process the information that the I.R.S will (based on past precedent) demand. The effect of these requirements is to make the process of obtaining refunds extremely expensive to small entities – more costly in most cases than the refund due.

---

[2] *See* Notice at section 5(a)(2) ("Persons that are not otherwise required to file a federal income tax return *must nevertheless file a return to obtain the credit or refund.*") (emphasis added).
[3] A recent article in the *New York Times* estimates that consumers with a cell phone and landline typically pay only $18 per year in FET. Ken Belson, *Phone Tax Laid to Rest at Age 108*, N.Y. TIMES, May 26, 2006.
[4] *See* Notice at section 5(d)(2) ("No safe harbor amount is allowed for entities.").

The crux of this motion is that millions of taxpayers were left with no meaningful remedy when the I.R.S. secretly drafted and abruptly issued the Notice without making the slightest effort to comply with the procedures required by the Administrative Procedure Act ("APA"), which is implicated when federal agencies make decisions with widespread and significant public impact. To enforce and preserve their rights under the Administrative Procedure Act and the United States Constitution, Plaintiffs seek a preliminary injunction directing the United States to supplement the Notice with respect to refund procedures for non-filing individuals and small entities (the latter consisting of small businesses and nonprofits). This preliminary injunction will compel Defendant to (1) comply with the APA's notice-and-comment procedures for rules, and (2) require consideration of the benefits, disadvantages and alternatives to the Notice to determine whether (if so, how) to treat fairly the groups that will be denied refunds by the Notice and to create a record for judicial review if the agency decides not to fix its process.[5]

The proposed order that accompanies this motion does _not_ seek to block the refund program in the Notice, which includes core relief that Plaintiffs sought from the I.R.S. for months before it was issued. It only seeks to require the agency to revisit the Notice, which was secretly drafted behind closed doors, to obtain public comment and give the prejudiced groups the refunds to which they are legally entitled, but will be denied under the scheme established by the Notice.

---

[5] Both procedural relief and substantive relief are sought. Each is independently justified, and each can stand alone as relief if the Court so decides.

## FACTUAL BACKGROUND

**A.**    **The Illegal Exaction of Money Under the Guise of the Telephone Excise Tax**

The Internal Revenue Code imposes excise taxes, including an excise tax of three percent on defined telephone services.  The taxed service relevant to this case is "toll telephone service."  Consistent with the state of telephony at that time of its amendment in 1965, § 4252(b) defines "toll telephone service," in relevant part, as a "communication for which . . . there is a toll charge which varies in amount with the distance <u>and</u> elapsed transmission time of each individual communication."  26 U.S.C. § 4252(b)(1) (emphasis added).

Since 1965, there has been a revolution in telecommunications and an extraordinary expansion of the use of telecommunications services.  With the break-up of the Bell telephone monopoly and the advent of wireless technology came a proliferation of long distance telephone services and service providers.  As part of these changes, long distance and wireless companies began to provide services that do not fit within the definition of "toll telephone service."  In particular, during the 1990s most moved from distance-sensitive pricing to plans under which subscribers pay a flat rate per minute for calls anywhere in the country.  AT&T, for example, abandoned distance and time billing in favor of a time-only formulation (often referred to as a "postalized rate") in 1997.  MCI followed suit in 2000.

The I.R.S. has long been aware that charges for long distance service based only on elapsed time do not fall within the statute's definition of "toll telephone service."  *See* Rev. Rul. 79-404, 1979-2 C.B. 382 ("Literally, the service provided in this case does not come within the definition of . . . 'toll telephone service' . . . because the charge for such

service does not vary with distance and therefore does not meet the requirement of section 4252(b)(1)."). The I.R.S. nonetheless continued to require long distance carriers to collect and remit a "tax" on calls that were not priced on a distance-sensitive basis and that Defendant therefore knew were not subject to tax under § 4252(b). As a result, the Government illegally collected billions of dollars from millions of Americans. The Government estimates its refund liability to be $15 billion just for the period from February 28, 2003 through August 1, 2006.

In response to lawsuits filed by large corporate taxpayers, at least a dozen federal courts – among them five Circuits, including the United States Court of Appeals for the District of Columbia Circuit – found that non-distance sensitive long distance service does not constitute "toll telephone service" within the meaning of the Internal Revenue Code, and ordered refunds.[6]

**B.      The I.R.S. Concession of Liability**

On May 25, 2006, over two months after this action was filed and after Plaintiffs moved this Court to enjoin the illegal collection of FET on non-distance sensitive toll calls, the I.R.S. suddenly reversed course and published Notice 2006-50. The Notice, wherein the Government concedes liability for the illegal exaction, was secretly drafted behind closed doors and abruptly issued without ever providing any notice or opportunity for public comment. In announcing this decision, former Secretary of the Treasury John Snow acknowledged that abandonment of the "tax" was long overdue: "[t]oday is a good day for American taxpayers; it marks the beginning of the end of an outdated, antiquated

---

[6] *Nat'l Railroad Passenger Corp. v. United States*, 431 F.3d 374 (D.C. Cir. 2005); *Fortis, Inc. v. United States*, 447 F.3d 190 (2d Cir. 2006); *Reese Bros., Inc. v. U.S.*, 447 F.3d 229 (3d Cir. 2006); *OfficeMax, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005), *rehearing en banc denied*, 428 F.3d 583; *American Bankers Ins. Group v. United States*, 408 F.3d 1328 (11th Cir. 2005).

tax that has survived a century beyond its original purpose, and by now should have been ancient history." "Treasury Announces End to Long-Distance Telephone Excise Tax," Treas. Dep't Press Release (May 25, 2006) (http://www.treas.gov/press/releases/js4287.htm). The I.R.S. announced in the Notice that it would cease collecting the tax, and would refund a <u>portion</u> of the illegally exacted money to taxpayers.

The I.R.S.'s proposed mechanism for the return of the fund comprised of illegally exacted FET will not give taxpayers anything approaching all of the money illegally collected. It also sets up an arbitrary and capricious procedure that will effectively deny millions of taxpayers the refunds to which they are entitled, allowing the I.R.S. to pocket the money.

Under the I.R.S.'s plan, individual (non-entity) taxpayers have two options: accept a "safe harbor" amount as a credit on their 2006 income taxes,[7] or prove to the Government's satisfaction the actual amount of taxes that they were improperly forced to pay between March 2003 and July 2006. Individuals who do not affirmatively file income tax returns with the I.R.S. will get *nothing* under this scheme.[8]

"Entities" will not be able to claim a non-documented "safe harbor" amount – they <u>must</u> compute the actual amount of "taxes" that were illegally collected over the past three years and four months (compiling records or other evidence that prove this amount to the Government's satisfaction), and claim that amount as a credit on their 2006 income

---

[7] The I.R.S. promises that the "safe harbor" amount will be designed to approximate how much the typical taxpayer paid in FET on toll and wireless service over the past three years. The actual "safe harbor" amount is "still under consideration and will be announced in later guidance." Notice at section 5(c).

[8] Under Section 6012 of the Code, individual taxpayers must have minimum gross income before they must file a U.S. individual tax return. The minimums depend on filing status. Married individuals over the age of 65 can earn up to $18,400 before a return is required. Under Section 86 of the Code, only a few individuals with an income of less than $25,000 will be required to report any portion of their Social Security benefit as gross income.

tax returns.[9] Entities that either do not file income tax returns or cannot satisfy the Government's record-keeping requirements will receive no refund under the Government's scheme, and the I.R.S. will keep the amounts it now concedes were illegally exacted from these taxpayers.

> **C.    The I.R.S. Scheme Tramples the Rights of Low-Income Americans, Particularly Low Income Senior Citizens**

By requiring taxpayers to request the refund on their 2006 income tax returns, the I.R.S. arbitrarily denies relief to the millions of Americans – over one-half of them elderly – who are not obligated to file a federal income tax return.[10]    The impact of this high-handed policy will be substantial.  Telephone subscribership among seniors is high, regardless of income.  In 2005, approximately 95% of households headed by an individual over 65 years old had a telephone.  Belinfante, *Telephone Subscribership in the United States*, Table 6 (FCC Industry Analysis and Technology Division May 2006). Telephone subscribership among other low-income individuals, the so-called "working poor," is also high.  In 2005, 80-90% of those with household incomes under $15,000 had a telephone; for those with incomes of $15,000-25,000 the figure was 91-94%.  *Id*. at Table 4.

Many low-income individuals – a disproportionate share of them seniors – are not required to file, and do not file, income tax returns.  In 1999, approximately 18 million nondependent tax units (out of a total of 139 million such units) did not file income tax returns.  Those aged 65 or above accounted for less than 20 percent of all non-dependent

---

[9] *See* Notice at section 5(d)(2) ("Taxpayers other than individual taxpayers (entities) may request only the actual amount of tax paid on nontaxable service billed during the relevant period.").

[10] Ironically, the I.R.S. responded to the difficulty of the previous methods of obtaining refunds by taking them away altogether.  *See* Notice at section 5(a)(2) ("[A] request for this credit or refund on any other form (such as a Form 720, 843, or 8849) will not be processed by the Service.").

tax units, but comprised more than half of all non-*filing* units. Orszag and Hall, *Nonfilers and Filers with Modest Tax Liabilities*, 100 Tax Notes 723 (Tax Policy Center, August 4, 2003) (http://taxpolicycenter.org/UploadedPDF/1000548_TaxFacts_080403.pdf). In 1998, there were 34.4 million individuals aged 65 and older, but only 16 million tax returns were filed covering at least one person aged 65 or older, and those returns covered 21.7 million people. In sum, 37% of seniors aged 65 and older – almost 13 million people – did not file income tax returns. Gist, *A Profile of Older Taxpayers*, 2 (AARP 2002).

    If one assumes, conservatively, that 85% of senior non-filers have telephones in their households, then nearly 1/3 of the nation's senior population (more than 10 million people) will be entitled to a refund, but will not receive one under the scheme described in the Notice without filing a tax return, which they would not otherwise be required to do. Nor are they likely to file if the only reason to do so is to receive the "safe harbor" credit, which will likely be between $20 and $50 – less than the cost of the least expensive income tax software or tax preparation service.

    It is arbitrary, capricious, and unreasonable to require low income Americans to file an income tax return solely to obtain money to which they are legally entitled for reasons that bear no relation to income taxes. In effect, the Notice requires taxpayers to acquire information about the Government's illegal tax, obtain the form and information necessary to file a return, and then fill out and file an otherwise unnecessary income tax return to get back money that these taxpayers never should have paid in the first place.

**D.**    <u>The I.R.S. Scheme Disadvantages Small Businesses and Nonprofits</u>

Notice 2006-50 also severely disadvantages small businesses and nonprofits by denying them a safe harbor amount, thereby requiring them to spend hours assembling records to secure what will in almost all cases be a relatively small refund.  In 2003, there were about 5.8 million firms with payrolls in the United States.  Of these, approximately 3.5 million – about 60% – had four or fewer employees.  *See* U.S. Census Bureau, *Statistics of U.S. Businesses* (2006) ( http://www.census.gov/csd/susb/susb03.htm)  In 2003, businesses with 0-4 employees averaged $256.26 per month in telecom expenditures.  Of this, $126.40 was long distance and wireless (cellular) service and therefore subject to the refund. Pociask, *A Survey of Small Businesses' Telecommunications Use and Spending*, 12 (S.B.A. Office of Advocacy, 2004) (http://www.sba.gov/advo/research/rs236tot.pdf). The income tax refund/credit on monthly spending of this size should be approximately $150, exclusive of interest, for the 40-month period covered by the Notice.

In order to receive this $150 refund, a small business taxpayer will have to complete an arduous and time-consuming process akin to the Form 8849 excise tax refund process that the I.R.S. summarily discarded in the Notice.  Initially, the taxpayer will have to gather (1) monthly telephone bills showing the amount of excise tax remitted for the past three years and four months; (2) contracts with its carriers for the past three years and four months demonstrating that the service in question is not local; and (3) proof that the taxpayer paid its phone bills (and, by implication, the amount of excise tax indicated on each phone bill), such as cancelled checks or indications of past amounts paid.

Once the taxpayer has compiled these materials, it will have to review 40 months of telephone bills and prepare a worksheet that computes tax remitted on non-distance sensitive long distance and wireless services. These refund amounts will then have to be summarized or enumerated on the entity's income tax return.

The I.R.S. does not shy away from acknowledging the burdens associated with the tasks outlined above. Indeed, according to the instructions appended to Form 8849 (the prior refund form), while "the time needed to complete and file the form and schedules will vary depending on individual circumstances ... estimated average times are" <u>over three hours</u> for the recordkeeping required for Form 8849, an additional <u>two hours</u> for the recordkeeping required for Schedule 6 (on which refund claims are specified), about 40 minutes to "learn[ ] about the law or the form[s]" and 38 minutes to "prepar[e], copy[ ], assembl[e] and send[ ] the form to the I.R.S." – all-in-all, over six hours. *See* I.R.S. Form 8849 at 3 (Rev. 2-2005). In addition to the burden of applying for the refund, a taxpayer must be prepared to substantiate and defend the refund claim in an audit, which may occur many years later.

The nearly 19 million individual proprietorships that make up the bulk of small businesses[11] in the United States will hardly be better off under this scheme. The owners of these businesses, who file taxes through Schedule C to their individual tax returns, are ignored in the Notice. They presumably will be eligible for the "safe harbor" credit, but that will be sized to cover the illegal FET paid on 40 months of *personal* long distance and wireless expenditures. Under the Notice, the only way that individual proprietors will be able to recover FET payments illegally exacted from their *businesses* will be

---

[11] *See* Pratt, The Impact of Location on Income: a Comparison of Homebased and Non-Homebased Sole Proprietors, 2 (S.B.A. Office of Advocacy, 2004) (http://www.sba.gov/advo/research/rs275tot.pdf) (18,925,517 sole proprietors filed Schedule C with their 2002 individual tax returns).

through the record compiling process described above, involving hours of work (assuming, of course, that the necessary records are even available) for a refund that in most instances will be $100 or less.

The situation facing small nonprofit organizations is equally inequitable. The I.R.S. reports that approximately 1.4 million entities in the United States are registered as tax-exempt organizations.[12] These organizations run the gamut from non-church religious institutions to arts and cultural groups, environmental groups, medical research institutes and clinics, shelters, youth sports organizations, civil rights groups, scientific research organizations, veterans' organizations, unions, fraternal organizations, volunteer fire departments, etc. In addition, there are an estimated 350,000 churches, synagogues and mosques in the United States, which are not required to register with the I.R.S. *See* Patrice Flynn, *Measuring Civil Society* (Flynn Research Projects, Spring 2004) (http://www.flynnresearch.com/MeasuringCivilSociety2004.pdf).

Of this total of approximately 1.65 million FET-paying nonprofit entities, only 35,000 file a Form 990-T, the form the I.R.S. has announced that it will require tax-exempt entities to file in order to make a refund claim under the Notice.[13] This means that virtually every nonprofit entity in the United States that wishes to obtain a refund of the FET it illegally paid will face all the problems outlined above for non-filing

---

[12] I.R.S., *Tax-Exempt Organizations and Other Entities Listed on the Exempt Organization Business Master File, by Type of Organization and Internal Revenue Code Section, Fiscal Years 2002-2005*, (http://www.irs.gov/pub/irs-soi/05db22eo.xls). Nonprofit hospitals and nonprofit educational organizations were, and are, exempt from FET pursuant to Sections 4253(h) and 4253(j) of the Code, but collectively those account for only about 7% of all registered nonprofits. *Id.*

[13] I.R.S., *Number of Returns, Gross Unrelated Business Income (UBI), Total Deductions, Unrelated Business Taxable Income (Less Deficit), Unrelated Business Taxable Income, and Total Tax, by Internal Revenue Code Section Describing Type of Tax-Exempt Organization, Tax Year 2002* (http://www.irs.gov/pub/irs-soi/02eo01ub.xls).

individuals. They must find out that a refund is available, obtain the forms, collect the records, and fill them and file a Form 990-T.

And the return they will have to file is far more burdensome and complex than an individual Form 1040. The I.R.S. estimates that it takes taxpayers *142 hours* to prepare and file a Form 990-T. *See* I.R.S. 2005 Instructions for Form 990-T at 20.   As a practical matter, tax-exempt entities have been known to refuse contributions that would require them to report unrelated business taxable income (UBTI) on a Form 990-T, as the UBTI regime is extraordinarily complex and considerably beyond the expertise of nearly all tax-exempt entities except those set up to handle those complications.  Hospitals, one of the few types of entities that deal with UBTI on a regular basis, are already exempt from the FET.  And of course, navigating the Form 990-T maze will be in addition to the burden of gathering the necessary information to substantiate an FET refund claim.

As is the case with small businesses, in many cases the refunds that would be yielded after compliance with the enormous burdens imposed by the I.R.S. will be modest.  The average monthly long distance and mobile telecommunications expenditures of small businesses with revenues of less than $200,000 is $109, yielding an average refund under the Notice of about $130.  Pociask, *Survey of Small Businesses' Telecommunications Use and Spending* at 16.  The average monthly spending, and therefore average refund, due the over one million nonprofits that have paid FET but have annual gross receipts of less than $100,000 will be half of this (or less) in most cases.

In sum, under the I.R.S.'s program, few (if any) of the over one million non-profits in the United States that have paid illegal FET and are undisputedly entitled to a

refund will actually receive any money. For all but the tiny fraction of tax-exempt

entities already filing a Form 990-T, the cost of filing that form will dwarf any possible

recovery.[14] In the Notice the I.R.S. switched the form to be filed by a non-profit entity

seeking an FET refund from Form 8849, which the I.R.S. estimated would take

approximately seven hours to fill out and does not reference a specialized body of law, to

a Form 990-T, which takes much more time and specialized knowledge to prepare. *See*

Notice at sections 5(a)(2) & 5(d)(3)(v). The I.R.S. may claim to this Court that it did not

realize that the change assured that very little of the FET illegally exacted from tax-

exempts will ever be claimed under its proposed procedure, but that claim rings hollow in

light of the information embedded in its own forms.

　　　　The amounts at stake are large. Assuming a "safe harbor" amount of $20-50, the

refunds that elderly non-filers will be entitled to but will not receive under the Notice will

be $200-500 million. Based on the population and telecommunications usage figures

quoted above, the foregone refunds for small nonprofits can be conservatively estimated

to be in the range of $100 million; for small business entities over $500 million; and for

individual proprietorships close to $2 billion. The I.R.S. admits that it has wrongfully

exacted billions of dollars from taxpayers. Notice 2006-50 purports to be an adequate

and reasonable administrative program to return those monies. It is not.

## ARGUMENT

　　　　In determining whether to issue a preliminary injunction, this Court "must

examine whether: (1) there is a substantial likelihood [Plaintiffs] will succeed on the

merits; (2) [Plaintiffs] will be irreparably injured if an injunction is not granted; (3) an

---

[14] Even assuming an extremely low professional fee rate of $50, the I.R.S.'s own estimate of the cost of preparing the Form 9990-T amounts to $7,000.

injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." *Serono Labs, Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C.Cir. 1998) (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977)). All four of those tests are satisfied by the instant Motion.

## I.    PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A.    Plaintiffs Are Substantially Likely to Prevail on the Merits of Their Objections to Notice 2006-50, as Being Violative of both the APA and Constitution.

#### 1.    The Refund-Constraining Scheme of Notice 2006-50 Violates the Procedural and Substantive Provisions of the Administrative Procedures Act.

"The Internal Revenue Service, of course, is an agency of the government, and review of its decisions may be governed by the APA." *Robinette v. Commissioner*, 439 F.3d 455, 461 n.5 (8th Cir. 2006). Courts review actions like Notice 2006-50 (*i.e.*, agency actions that are not "legislative" rules issued pursuant to specific delegations of authority), under a "reasonableness" standard. *Natl. Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476-77 (1979). The I.R.S. must "implement[] a congressional mandate in a reasonable manner." *Swallows Holding, Ltd. v. Commissioner*, 126 T.C. 96, 130 (Jan. 26, 2006) (citing six Supreme Court cases). *Swallows Holding* struck down the I.R.S.'s attempt to deny tax deductions to entities that did not meet an I.R.S. imposed "timely filing" requirement that, the court found, "does not fill in a gap left open by the statute as to a timeliness requirement but simply adopts respondent's unsuccessful litigating position." *Id.* at 135-36

The requirements that the Notice places on non-filers, small businesses and most nonprofits do not implement any Congressional mandate – much less in a reasonable manner. "The judiciary has enough expertise and experience to ascertain congressional intent . . . and any deference that is owed to the Secretary does not mean that the judiciary as a matter of course should simply ratify an unauthorized assumption by the Secretary of major policy decisions properly made by Congress; e.g., here, a [taxpayer]'s forfeiture of deductions absent its filing of a timely tax return." *Id.* at 136. Accordingly, review of the Notice should proceed under a reasonableness standard.

Two separate but reinforcing aspects of the Notice – its procedural inadequacies and its substantive unreasonableness – violate the APA and especially disadvantage non-filers (particularly low-income elderly taxpayers and small nonprofits), small business entities, and individual entrepreneurs.

**2.      Notice 2006-50 is Procedurally Inadequate.**

The I.R.S. has at its disposal an array of administrative policymaking procedures. The procedures it employed to decide whether, and how, to refund $15 billion illegally exacted from American taxpayers are its least formal, least public, most unilateral, and most secret.

The I.R.S. customarily implements policy by promulgating regulations pursuant to the APA rulemaking procedures laid out in 5 U.S.C. § 553. Generally, a rulemaking starts with a notice of proposed rulemaking, 5 U.S.C. § 553(b),[15] and proceeds to a period

---

[15] 5 U.S.C. § 553(b) provides, in pertinent part:
**(b)** General notice of proposed rule making shall be published in the Federal Register . . . . The notice shall include –

**(1)** a statement of the time, place, and nature of public rule making proceedings;
**(2)** reference to the legal authority under which the rule is proposed; and

of public comment, followed by the promulgation of final rules that are accompanied by a statement of their basis and purpose, 5 U.S.C. § 553(c).[16]

     The I.R.S. uses these procedures to adopt binding legislative regulations pursuant to specific grants of rulemaking authority, as well as interpretive regulations pursuant to a general grant of interpretive rulemaking authority.  *See* ABA Section of Taxation, *Report of the Task Force on Judicial Deference* 104 Tax Notes 1231 (Sept. 13, 2004) ("ABA Taxation Task Force Report").[17]  Lesser I.R.S. policymaking procedures, though still structured, accompany the promulgation of "revenue rulings" and "revenue procedures." *Id.*

     As FET policy evolved, the I.R.S. used both notice-and-comment rulemaking and revenue rulings to develop and test its positions on the issues surrounding the tax.  In 2003, when the I.R.S. belatedly proposed to redefine toll telephone services by regulation to bolster its case for the legality the FET, it did so by announcing (and seeking comment on) a proposed rule.  2003 Tax Notes Today 66-9.  Far from being a mere formality, the process drew public commentary in the way it was designed to.  On September 10, 2003, the I.R.S. held a hearing regarding the proposed change.  Martin A. Sullivan, *Economic Analysis: Is the Telephone Tax About to Unravel?,* 102 Tax Notes 196, 198 (2004). "Industry commentators were unanimous in their call for withdrawal of the proposed

---

**(3)** either the terms or substance of the proposed rule or a description of the subjects and issues involved.

[16]  5 U.S.C. § 553(c) provides:
**(c)** After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

[17]  Some of the procedures for legislative rulemaking are foregone for interpretive rulemaking, pursuant to the distinction provided in 5 U.S.C. § 553(b)(A).

regulations." *Id.* The I.R.S. never adopted the proposed regulations. APA procedures can, and do, work.

The I.R.S. did not use rulemaking procedures before announcing its program for returning illegal FET payments.[18] It put forth the refund-constraining scheme in Notice 2006-50 without prior announcement or solicitation and consideration of public comment. Indeed, so rushed was the program announcement that the I.R.S. has yet to quantify the crucial safe harbor amount, issue new forms or schedules to replace the Form 8849 nullified by the Notice or explain what those schedules will require, describe the documentation that taxpayers will be required to assemble or retain to claim refunds other than the "safe harbor," or release other key elements of its plan.

The lack of procedures or safeguards surrounding the I.R.S.'s use of "Notices" was recently addressed in the ABA Taxation Task Force Report:

> Notices. Unlike revenue rulings and revenue procedures, both the history and purpose of notices are obscure. No Treasury regulation prescribes or describes notices. The Internal Revenue Bulletin, in which most notices are published, is silent on their substantive impact . . . .
>
> Other official sources provide a little more insight. The chief counsel Publication Handbook describes the various purposes of a notice . . . .

---

[18] Indeed, the I.R.S. violated its own procedures by using an informal notice to stop the collection of the FET. Telephone companies are required to collect and pay over excise taxes, including the FET, under the formally adopted Treasury Regulation 49.4291-1. They are required to file a quarterly return pursuant to Treasury Regulation 49.6011(a)-1. The I.R.S. Manual, however, expressly recognizes the limitation of notices and other mere public pronouncements in the hierarchy of authority:

> Federal income tax regulations are the official Treasury interpretation of the Code. . . Regulations are the most authoritative form of published guidance. **Only regulations may be used to affect existing regulations. Other forms of published guidance may be used to announce how the IRS may address an issue in regulations, but they do not have the force and effect of regulations.**

Internal Revenue Manual, § 32.1.1.4 (08-11-2004) (emphasis supplied).

> Commentators say very little about notices. Michael Saltzman's I.R.S. procedure treatise discusses a litany of guidance types, from revenue rulings to information letters, but never mentions notices. [Footnote omitted.] Another treatise contains only a brief description of notices:

>> In recent years, in lieu of releasing time-consuming revenue rulings and revenue procedures, the Service has been relying heavily on notices, announcements, and information releases. The Service issues a notice when it wishes to provide guidance before a ruling or regulation is available.

>> Ira L. Shafiroff, *Internal Revenue Service Practice & Procedure Deskbook*, section 1:4:3(D)(3d ed. 2003).

ABA Taxation Task Force Report at 1238.    Consider, in contrast, the care taken by the

I.R.S. in rulemakings:

> In practice, the I.R.S. gives the same careful consideration, including publication of proposed regulations with opportunity for notice-and-comment and a preamble highlighting particular comments and issues, to both legislative and interpretive regulations. The Internal Revenue Manual includes a 40,000 word chapter entitled,' Regulation Drafting Handbook,' IRM 30.15.20 (1995). . . .

*Id.* at 1239.

When full rulemaking procedures are not followed, as is the case with revenue

rulings, the I.R.S. uses less formal procedures that ensure reasonable internal review.[19]

Even these were absent, however, from the consideration of Notice 2006-50.

The Notice was not preceded by a preliminary announcement – an "Advance

Notice of Proposed Rulemaking" – that would have focused the attention of the affected

public upon a controversial and important action. Although the I.R.S. heard from

---

[19] "Revenue rulings, next in line [in the hierarchy of procedures], are issued through a routinized and comprehensive program within the agency, but public notice-and-comment is not part of the process. *Other forms of informal guidance* [e.g., Notices] *are subject to increasingly less formal review and issuance procedures.*" ABA Taxation Task Force Report at 1241.

representatives of the telephone companies before issuing the Notice,[20] affected

taxpayers were given no notice or opportunity to comment on the Notice and/or to

suggest alternatives to its more flawed provisions. Nor did the I.R.S. even attempt to lay

out, as it would in a rulemaking, the policy analysis and legal basis for some of the more

controversial choices embedded in the Notice.

It is hornbook APA law that courts will invalidate a substantive rule if it is not

promulgated in accordance with the APA's notice requirements. *Chrysler Corp. v.*

*Brown*, 441 U.S. 281, 313 (1979); *W.C. v. Bowen*, 807 F.2d 1502, 1505 (9th Cir. 1987);

*Alaniz v. OPM*, 728 F.2d 1460, 1470 (Fed. Cir. 1984). The D.C. Circuit has reversed

agency announcements of rules on controversial topics – like those in Notice 2006-50 –

because the agency followed procedures that were inadequate under the APA.[21] For

example, in *Sugar Cane Growers Cooperative v. Veneman*, 289 F.3d 89 (D.C. Cir. 2004),

a federal agency anticipated the I.R.S.'s conduct here and sought to announce how it

would run a refund program through a public announcement, without notice-and-

comment.[22] It issued a Notice of Program Implementation, an explanatory set of question

and answers, and a press release – much as the I.R.S. issued Notice 2006-50, noting

certain details would follow. When challenged, the Government sought to "defend[] the

---

[20] The I.R.S. (appropriately) calls the telephone companies Collectors – they do not bear the economic burden of the FET and will not be entitled to substantial refunds.

[21] *See, e.g.*, *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002); *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999); *AFL-CIO v. Donovan*, 757 F.2d 330, 339 (D.C. Cir. 1985); *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 548-49 (D.C. Cir. 1983); *Tabor v. Jt. Bd. for Enrollment of Actuaries*, 566 F.2d 705 (D.C. Cir. 1977); *Nat'l Welfare Rights Org. v. Mathews*, 533 F.2d 637 (D.C. Cir. 1976); *Endangered Species Comm. of Bldg, Indus. Ass'n v. Babbitt*, 852 F. Supp. 32 (D.D.C. 1994).

[22] The program gave refunds to sugar beet growers who had engaged in specified amounts of crop diversion. *Id.* at 91-92. The refunds were made as payments in kind rather than in cash. *Id.*

Department's failure to engage in notice-and-comment rulemaking by asserting the [program] announcement was not really a rule." *Id.* at 95.

The D.C. Circuit rejected the argument that the refund program announcement was not a "rule" for APA purposes. "The APA defines a rule very broadly as 'the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . .' 5 U.S.C. § 551(4)." 289 F.3d at 95. As the Court explained in terms that apply equally to the Notice in this case:

> We have little difficulty—as did the district court—in rejecting this argument. The August 31 press release, the September Questions and Answers and most notably the September 7 Notice of Program Implementation set forth the bid submission procedures which all applicants must follow, the payment limitations of the program, and the sanctions that will be imposed on participants if they plant more in *future* years than in 2001. It is simply absurd to call this anything but a rule "by any other name."

*Id.* at 97.

As the ABA Taxation Task Force Report noted, the APA applies to the I.R.S. as it does to any other agency.[23] For example, in *American Standard, Inc. v. United States*, 602 F.2d 256, 267-69 (Ct. Cl. 1979), the I.R.S. promulgated regulations about when a trade-related corporate deduction could be taken by an affiliated group. The Treasury issued an initial notice of a proposed rulemaking, and then a second proposal, but nevertheless violated the APA because it could "not convince [the court] that the proposal did give the public fair notice of the intendment of the final form of the

---

[23] "Courts have indicated that the notice-and-comment procedure enhances the quality of judicial review by providing affected parties an opportunity to develop an evidentiary record to support their objections to rules." *See, e.g., Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983); Marathon Oil Co. v. EPA, 564 F.2d 1253, 1271 n.54 (9th Cir. 1977); *cf. Schwalbach v. Commissioner*, 111 T.C. 125, 228 (T.C. 1998)." ABA Taxation Task Force Report at 1240.

regulation. Therefore, we hold that the notice provision of the APA was violated in this case and the regulation is invalid." *Id* at 268; *see also AMA v. United States*, 887 F.2d 760 (7th Cir. 1989) (testing whether an I.R.S. rulemaking proposal satisfied APA notice requirements).

As explained above, the Notice does far more than merely acquiesce in a series of adverse appellate decisions. The agency seeks to impose entirely unprecedented, detailed, and (to millions of taxpayers) burdensome requirements by which it proposes to refund what it now admits were illegally collected taxes. If allowed to stand, the I.R.S.'s action will deprive a substantial portion of the public of refunds that the I.R.S. concedes are due, and allow the Government to keep billions of dollars it has acknowledged it illegally exacted. The I.R.S.'s violations of the APA thus do not merely offend some abstract notion of proper administrative process; they concretely deny the procedural rights of millions of taxpayers, with important and detrimental consequences.

Public expressions of interest in FET have been substantial, as evidenced by extensive press coverage of the Notice.[24] The FET has also drawn serious commentary from public policy professionals of precisely the kind that would be helpful in assembling a record and creating an appropriate refund process.[25] Such scholars would have

---

[24] *See, e.g., I.R.S. Will Continue Collecting Communications Excise Tax*, 109 Tax Notes 616 (2005); Susan Simmonds, *Congress, I.R.S. Get Wake-Up Call on Antiquated Telephone Tax*, 105 Tax Notes (2004); *Communications Excise Tax Collection Will Continue, I.R.S. Says*, 104 Tax Notes 722 (2004); Martin A. Sullivan, *Economic Analysis: Is the Telephone Tax About to Unravel?*, 102 Tax Notes 196 (2004); *I.R.S. Revokes Ruling on Communications Tax Exemption*, 97 Tax Notes 494 (2002); Ken Belson, *Phone Tax Laid to Rest at Age 108*, N.Y. TIMES, May 26, 2006.

[25] *See, e.g.*, Gene Steurle, *The Telephone Excise Tax: Why Keep a Bad Tax?*, 87 Tax Notes 281 (2000), and sources cited ( "In 1988, under my supervision, Treasury's Office of Tax Analysis sent a report to Congress that argued, 'the communications excise tax should be allowed to expire,' because '[t]he tax causes economic distortions and inequities among households.") Steurle is now at the Urban Institute. The I.R.S. should have sought the input of analysts of his experience and expertise, rather than going out of its way to avoid the benefit of their expertise.

contributed to a notice-and-comment rulemaking had the I.R.S. not precluded their involvement.

Given the I.R.S.'s undeniable interest in minimizing the cost to the Government of its own illegal conduct, public input and judicial oversight are essential if millions of taxpayers are to get the FET refunds to which they are entitled.

### 3.    Notice 2006-50 Is Substantively Unreasonable.

Courts substantively review I.R.S. rules, and will invalidate them when appropriate. *See, e.g., Rite Aid Corp. v. United States*, 255 F.3d 1357, 1359 (Fed. Cir. 2001) (I.R.S. rule reviewed and invalidated); *Schuler Indus. v. United States*, 109 F.3d 753, 755 (Fed. Cir. 1997) (I.R.S. rule reviewed and upheld). As noted above, because the Notice in this case was manifestly not "legislative," it should be reviewed under the "reasonableness" standard. *See, e.g., United States v. Vogel Fertilizer Co.*, 455 U.S.16, 26 (1982) (invalidating I.R.S. rule under the "reasonableness" standard); *National Muffler Dealers Assn.*, 440 U.S. at 476; *Swallows Holding, Ltd.*, 126 T.C. at 135-36 (invalidating rule under the "reasonableness" standard and citing many prior cases doing so).

The reasonableness standard involves reviewing a rule on the record, if any, that an agency has compiled, and focuses especially on how thoroughly and persuasively the agency has studied, discussed, and addressed the major benefits and costs of, and alternatives to, its proposal. However, the secret closed-door session that led to the issuance of the Notice provides no public record, evidence that the I.R.S. considered the costs of or alternatives to the approach it adopted, nor evidence of compliance with any of the APA requirements. On review, the Plaintiffs, the public, and the reviewing Court

cannot have any confidence that the I.R.S. did, in fact, consider alternatives and reach a

reasonable conclusion as to the wisdom of the rules it adopted, particularly with respect

to their effects on individual non-filers, small businesses, and small nonprofits.

Even for policy steps of much lesser moment than this, the courts have expressed

little confidence in, and shown little deference to, I.R.S. decisions announced through a

mere Notice. *See Costantino v. TRW, Inc.*, 13 F.3d 969, 981 (6th Cir. 1994) ("the court's

deference to the I.R.S. Notice was inappropriate. Unlike the regulations, IRS rulings do

not have the force of law and are merely persuasive authority.") (citing and quoting

*Threlkeld v. Commissioner,* 848 F.2d 81, 84 (6th Cir. 1988).

We have already identified a number of the substantive problems of the self-

serving plan announced in the Notice. First, the Notice will effectively deny refunds to

over ten million taxpayers who subscribe to telephone service but do not file income tax

returns, most of them seniors whose incomes are below the threshold for filing income

tax returns (largely because of the non-taxability of most Social Security payments).

Second, the I.R.S.'s scheme will effectively deprive millions of small business and

nonprofit entities of the refunds to which they are entitled. The Notice provides that only

individuals, and not entities, can receive a safe harbor refund without submitting

documentation.[26] Entities will be able to obtain refunds only by complying with

documentation and filing requirements that will inevitably impose costs (in time and

money) much higher than the modest refunds to which the millions of small entities are

entitled.

---

[26] Notice at § 5(d)(2). The Notice does not state the amount of the safe harbor refund, saying only that it will be determined at some unspecified future date. *Id.* at § 5(c)(1)(i). Until the amount is known, the sufficiency of the refunds to individuals cannot be assessed.

There are ways to address these problems, but not within the income tax system. The most appealing solution would involve establishing a fund that would be used to process claims and issue refunds (perhaps via credits on telephone bills, or a supplement to Social Security checks) through a class-wide settlement with the taxpayers' legal representatives. These representatives would use taxpayer and carrier records to locate, and get refunds to, those individuals and nonprofits who do not file tax returns. As discussed in the Complaint and elsewhere in this filing, such an alternative would track the statutory and regulatory structure by which this excise tax has been collected and paid much more closely than the income tax refund methodology adopted by the I.R.S. Absent a safe harbor for small businesses, the same kind of mechanism can be employed to get small business entities and individual proprietorships the refunds they are due.

**B.**     **Plaintiffs Are Likely to Succeed on the Merits of their Claims that the Limited Refunds Announced in Notice 2006-50 are Tantamount to an Unconstitutional Taking, and that the Notice Fails to Provide Taxpayers with a Constitutional, Clear and Certain Remedy.**

**1.     The Failure of the Government to Provide Full Restitution to Plaintiffs and Class Members Is an Unconstitutional Taking.**

Notice 2006-50 purports to return to Plaintiffs and Class members only three years and four months worth of illegally exacted FET. The Fifth Amendment to the United States Constitution prohibits the deprivation of property by the Government without due process of law or just compensation. The Government conceded in the Notice that it had collected the toll portion of the communications excise tax from the Plaintiffs and Class members without Congressional authorization, and then (inexplicably) announced that it would provide only partial restitution of the illegal

exaction. The failure of Defendant to provide full restitution to Plaintiffs and Class members of monies that the Government now admits were improperly exacted violates the Fifth Amendment.

### 2. The Failure of the Government to Provide a Clear and Certain Post Deprivation Remedy Is Also Unconstitutional.

The Fifth Amendment mandates that the Government provide a "clear and certain" post deprivation remedy for improperly exacted "taxes,"[27] but the refund procedures in the Notice do not give Plaintiffs and Class members such a remedy.

The Notice provides only one method for obtaining the return of monies illegally collected – the filing of an income tax return. As a practical matter this will prevent many class members (particularly those individuals and nonprofits who do not file returns, and for whom the time and cost of filing a return would exceed their refund) from obtaining any recourse, and therefore is not a constitutional, clear and certain remedy for these class members.

In addition, the Notice does not permit an "entity" to elect to receive the safe harbor amount that will be available to individuals. It thereby requires millions of small businesses and nonprofits to obtain telephone bills and proof of payment so that they can calculate and document the refund to which they are entitled – a process that in most cases will be far more costly (in time and money) than the refund they will be due at the end of the process. The burdens imposed by the Notice will deprive these entities of a constitutional, clear and certain remedy for the unlawful exaction of the FET.

---

[27] *See McKesson Corp. v. Div. of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Florida,* 496 U.S. 18, 19 (1990).

II.    **WITHOUT RELIEF THE PLAINTIFFS WILL SUFFER**
       **IRREPARABLE INJURY.**

When a party makes out its case under the APA, even if it styles the relief being

sought as injunctive, it is entitled to relief under that statute, regardless of whether it has

suffered irreparable injury. *See American Bioscience, Inc. v. Thompson*, 269 F.3d 1077,

1084 (D.C. Cir. 2001) ("[W]hether or not appellant has suffered irreparable injury, if it

makes out its case under the APA it is entitled to a remedy."). Assuming the Plaintiffs

are entitled to relief under the APA, they have still demonstrated irreparable injury

entitling them to preliminary relief.

Taxpayers who, for whatever reason, do not to file an income tax return requesting

the refund may well forfeit their rights permanently. In *Boddie v. Connecticut*, 401 U.S.

371 (1971), the Court ruled in favor of a class of Connecticut welfare recipients who

challenged the requirements for payment of court fees and costs that restricted their

ability to file divorce actions. As Justice Harlan dryly noted, "the average cost to a

litigant for bringing an action for divorce is $60." *Id.* at 372. Yet, the Court noted the

real practical obstacles to the indigent participating in procedures that are non-

burdensome for those with higher incomes and scrutinized closely the government's

"arguments for this kind of fee and cost requirement" and found them wanting. *Id.* at

381.

As *Boddie* indicates, the injury created by the Notice's filing requirement has a

constitutional dimension because the Government has created a barrier to low income

individuals who seek to vindicate legal rights that are readily enforceable by those with

higher incomes.[28] An injury of this kind is irreparable to the indigent person. Even though the amount of money at issue may seem small to those with greater incomes and assets, the I.R.S. has used their indigence to deprive them of the redress that the better-off will receive from an injury imposed by the federal government (collection of the FET).

The failure to follow procedural requirements before releasing the Notice, and the Notice's failure to adopt justifiable procedures, amounts to a double irreparable injury to the indigent, because it means that their objections to the deprivation inflicted upon them by virtue of their indigence will be denied any opportunity for meaningful consideration in the halls of government. They have not only been disenfranchised, they have been disenfranchised without being given an opportunity to raise objections to the promulgation of the rule that sealed their fate.

Small business entities, individual proprietors, and small nonprofit entities will also suffer irreparable injury absent the requested relief. The Notice has grouped them with large, well-off businesses and imposed what are (for them) burdensome and costly requirements that they will have to meet before obtaining relatively modest refunds. Individual proprietorships and small business entities will have to spend hours, and often substantial sums, to assemble records and fill out schedules 'proving' entitlement to the modest refunds that they are unquestionably owed. The overwhelming majority of non-

---

[28] *Commissioner v. Shapiro*, 424 U.S. 614, 629 n.11 (1976) (citing case of welfare recipients deprived of limited sums without adequate process in analysis of what is irreparable injury for enjoining I.R.S.); *McKesson Corp. v. Div. of Alcoholic Beverages and Tobacco*, 496 U.S. at 31 (in state context, due process requires meaningful relief); *Stone Container Corp. v. United States*, 229 F.3d 1345, 1349 (Fed. Cir. 2000) (as to applying to the I.R.S. the *McKesson* principles that the government must "provide meaningful backward-looking relief" in tax cases, these "principles are equally applicable to the federal government through the Due Process Clause of the Fifth Amendment"); *Trinity United Methodist Church v. United States*, 1975 WL 613 (N.D. Ala. Jan. 16, 1975) (granting preliminary injunction to a nonprofit as to excise tax; "in the absence of the issuance of the preliminary injunction, the plaintiff would be irreparably harmed" because the nonprofit would have to file two claims with the I.R.S. "with respect to what would otherwise be considered negligible amounts of tax, [and] because of the great expense involved and the dual effort in both time and money in prosecuting two such procedures").

profits will face not only this burden, but also the requirement that they incur the substantial cost of filing an otherwise unnecessary tax return (Form 990-T) to secure a modest refund.  These entities will suffer a doubly irreparable injury, similar to the indigent, as they too are forced to comply with procedures that are understandable when imposed on the well-off (in this instance, large business entities) but that effectively deny them the rightful return of the admittedly illegal FET.  And they, too, have not even been given an opportunity to raise objections to the promulgation of the rule sealing their fate.

III.     **THE PRELIMINARY INJUNCTION THAT PLAINTIFFS SEEK WILL NOT SUBSTANTIALLY HARM THE DEFENDANT.**

        Conversely, grant of the requested injunction would not substantially harm the Defendant.  This is true first and foremost because the I.R.S. acknowledges that it owes taxpayers the money it illegally took from them. *Williams Packing*, 370 U.S. 1 (1962), makes clear that when, as in this case, the United States has no argument for legitimately declining to return an illegally collected tax, it is not harmed by being ordered to refund the money illegally collected:

>        The manifest purpose of sec. 7421(a) is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund. In this manner the United States is assured of prompt collection of its <u>lawful</u> revenue. Nevertheless, if it is clear that under no circumstances could the Government ultimately prevail, the central purpose of the Act is inapplicable and, under the Nut Margarine case, . . . [defendant] may be enjoined if equity jurisdiction otherwise exists. In such a situation the exaction is merely in 'the guise of a tax.'

*Williams Packing*, *supra*, 370 U.S. at 7 (footnote and citations omitted, emphasis added).

        Specifically as to APA relief, there is time for the I.R.S. to follow appropriate procedures in coordination with the rest of the refund machinery it envisions.  To be obliged to develop a record and to make a considered decision is not "substantial harm."

## IV.    THE PUBLIC INTEREST STRONGLY FAVORS GRANTING THE REQUESTED INJUNCTION.

The public interest strongly favors the issuance of the requested injunction.  It is hardly unfair that large businesses be given a means, through the plan set forth in the Notice, to obtain refunds of the illegal taxes they have paid.  It is unfair and unlawful for the I.R.S. to deny millions of individual taxpayers and small businesses a comparably effective means of redress.  The only government action that is less in the public interest than imposition of an illegal regressive tax is the announcement of a refund program that is equally regressive because it is structured (by accident or by design) to deny refunds to the least affluent victims.  Low income individuals, small businesses, and small nonprofits will be burned not once but twice – first by being forced to bear a disproportionately large share of the original tax burden, and then by receiving a disproportionately small share of the refunds after the tax is abandoned.

There is nothing unusual in requiring that procedures suit the situation of a large fraction of the nation's 100 million+ individual taxpayers.  *See United States v. Brockamp*, 519 U.S. 347, 352 (1997) (in determining whether equitable tolling applies to tax refunds, Court noted that the I.R.S. processes over 200 million returns and issues 90 million refunds each year); *Stone Container Corp.*, 229 F.3d at 1353 (same).  The millions of members of the plaintiff class have rights established by this and other Circuits, and now acknowledged by the Government.  The I.R.S. has chosen to put these class members in a position where they will only have meaningful rights if this Court issues a preliminary injunction, and it is in the public interest for the Court to do so.

## CONCLUSION

Allowing the process outlined in Notice 2006-50 to proceed without change will violate the APA and the constitutional rights of taxpayers, particularly those that earn less than is required to file an income tax return, small businesses, and nonprofit organizations. Accordingly, Plaintiffs request a preliminary injunction ordering one or both of the following:

(1) that Notice 2006-50 be remanded to the I.R.S. to supplement it with a notice-and-comment procedure as to the particular issues raised herein; and/or

(2) that Notice 2006-50 be remanded to the I.R.S. to promulgate provisions, on the basis of an adequate record, that assure that the Plaintiffs and all members of the class receive the refunds to which they are untitled by virtue of the Government's admission that the FET on non-distance sensitive toll calls (and bundled services that include toll calling, including wireless services) was unlawfully exacted and should be returned.

For all of the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be granted.

DATED: July 6, 2006.

CUNEO GILBERT & LADUCA, LLP

By:_____

Jonathan W. Cuneo, Esq. (DC Bar# 939389)
David Stanley, Esq. (DC Bar# 174318)

Charles J. LaDuca, Esq. (DC Bar# 476134)

Steven N. Berk, Esq. (DC Bar #432870)
William Anderson, Esq.
507 C Street, NE
Washington, DC 20002
Phone: 202-789-3960
Fax: 202-789-1813

Nicholas E. Chimicles, Esq. (pro hac vice)
Benjamin F. Johns, Esq. (pro hac vice)
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041

Henry D. Levine, Esq. (DC Bar# 952770)
Stephen J. Rosen, Esq. (DC Bar# 441942)
LEVINE, BLASZAK, BLOCK AND
BOOTHBY, LLC
2001 L Street, NW, Suite 900
Washington, DC 20036

Robert J. Cynkar, Esq. (DC Bar# 957845)
EGAN, FITZPATRICK, MALSCH &
CYNKAR, PLLC
8300 Boone Boulevard, Suite 340
Vienna, VA 22182

Christopher Weld, Jr., Esq. (pro hac vice)
Kevin Peters, Esq. (pro hac vice)
TODD & WELD, LLP
28 State Street
Boston, MA 02109

Professor Charles Tiefer (DC Bar# 330910)
University of Baltimore
3904 Woodbine Street
Chevy Chase, MD 20815

R. Montgomery Donaldson
MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP
300 Delaware Avenue, Suite 750
Wilmington, Delaware 19801

Stephen A. Madva
Clifford Scott Meyer
MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA 19109-1030

Andrew N. Friedman (DC Bar# 375595)
Victoria S. Nugent (DC Bar# 470800)
COHEN, MILSTEIN, HAUSFELD &
TOLL, PLLC
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005

David L. Wales
Mark C. Rifkin
Martin Restituyo
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016