# EXHIBIT A



820 First Street NE, Suite 510
Washington, DC 20002

Tel: 202-408-1080
Fax: 202-408-1056

center@cbpp.org
www.cbpp.org

August 3, 2006

# REPAYING AN INVALID EXCISE TAX TO LOW-INCOME HOUSEHOLDS THAT DO NOT FILE INCOME TAX RETURNS

by Robert Greenstein, Arloc Sherman, John Wancheck, and Nick Johnson

## Summary[1]

IRS Notice 2006-50 establishes a procedure to refund to taxpayers payments of a federal excise tax on toll telephone calls, which the federal government now concedes to lack legal foundation. Under the procedure, the IRS will make excise tax refunds available to households solely through tax credits on income tax returns. Those who do not file an income tax return will not be repaid.

Many low-income Americans who have little or no earnings are not required to file an income tax return and do not do so. This analysis examines two questions:

1. How many households that have telephones do not file federal income tax returns, and to what extent are such households low-income and/or elderly?

2. To what extent would non-filers with telephones be likely to file a return to obtain an excise tax refund?

In brief, the findings of this analysis are as follows:

- Based on data from the Census Bureau's Current Population Survey (for years 2002, 2003, and 2004), an average of 15 million households per year with telephones did not file a federal income tax return in these years, of which the majority — 8.5 million households — were headed by someone age 65 or older.

- The vast majority of these 15 million households were low income: 12.3 million of these households had incomes below twice the poverty line, with 6.6 million of these 12.3 million low-income households being households headed by an elderly person. Some 6.3 million of these households had income below 100 percent of the poverty line.

---

[1] This analysis was prepared at the request of plaintiffs' counsel in Sloan v. United States. The Center is receiving compensation for its time in researching and preparing this analysis.

| TABLE 1 | | | |
|---|---|---|---|
| **Nonfiler Heads of Household, by Age, Poverty Ratio, and Presence of Telephone** (three-year average, 2002-2006) | | | |
| | **All ages** | **Under 65** | **65 & up** |
| Total Non-Filer Households (000s) | | | |
| All Incomes | 16,509 | 7,602 | 8,907 |
| Below 100% of poverty | 7,420 | 4,993 | 2,428 |
| Below 200% of poverty | 13,790 | 6,779 | 7,010 |
| | | | |
| With Telephone in Household (000s) | | | |
| All Incomes | 14,956 | 6,481 | 8,474 |
| Below 100% of poverty | 6,340 | 4,113 | 2,227 |
| Below 200% of poverty | 12,331 | 5,709 | 6,621 |
| | | | |
| With Telephone in Household (%) | | | |
| All Incomes | 91% | 85% | 95% |
| Below 100% of poverty | 85% | 82% | 92% |
| Below 200% of poverty | 89% | 84% | 94% |

Source CBPP tabulations from the March 2003, March 2004, and March 2005 Current Population Survey

- No data directly or precisely answer the question of how many of these households would file a tax return to obtain the excise tax refund. However, data from several sources shed light on this matter. Based on these data sources, it is our opinion that fewer than one-third of these households would be likely to file a federal income-tax return to secure this repayment.

# I. HOW MANY HOUSEHOLDS WITH TELEPHONES ARE NON-FILERS?

The Census Bureau's Current Population Survey collects data each year on household income, age, and the presence or absence of a telephone. The Census Bureau also has developed and uses a tax simulation model to estimate households' federal income taxes. These Census data and the Census Bureau's tax simulation model can be used to estimate the number of non-filer households that have telephones, by income and age.

An analysis of Census data for the three most recent years for which such data are currently available (2002 – 2004) yields the results shown in Table 1. Three years of Census data are merged in order to produce sample sizes large enough to provide statistically reliable results. Merging three years of Census data in this fashion is a standard methodology that the Census Bureau and academic researchers employ.

As Table 1 indicates:

- An estimated 16.5 million U.S. households were headed by someone who did not file federal income taxes. Of this group, 7.4 million were poor, with annual cash income below the federal

poverty line, and 13.8 million had low income (less than two times the federal poverty line).

- Most of these non-filers had telephones — approximately 15 million non-filer households, or 91 percent of the total, had a telephone in their home.

- Some 82 percent of the non-filer households with telephones were low income, having incomes below 200 percent of the poverty line. There were 12.3 million such households. Slightly more than half of those households (6.3 million households) had incomes below 100 percent of the poverty line. The federal poverty line is $9,645 for a single individual, $12,334 for a two-person family, and $19,307 for a family of four.[2]

We also estimated the number of non-filers who are elderly (age 65 or older).

- An estimated 8.9 million U.S. households that did not file federal income taxes were headed by someone age 65 or older. Most of these elderly non-filers had telephones: approximately 8.5 million of the elderly non-filer households, or 95 percent of them, had a telephone in their home.

- Looked at another way, 57 percent of all non-filer households with telephones (8.5 million out of the 15 million non-filer households with telephones) were headed by someone aged 65 or over. Some 78 percent of the elderly non-filer households with telephones — 6.6 million of them — were low income, having income below twice the poverty line. Some 2.2 million were poor.

·    Methodology

To derive these estimates, we used household-by-household survey data from the Annual Social and Economic Supplement (ASEC) of the Census Bureau's Current Population Survey (CPS). The CPS has been collected by the Census Bureau from a representative sample of American households each month for nearly 60 years and is the source of the nation's official monthly data on household employment and unemployment.

Each year in March (and more recently in February and April as well), the CPS ASEC asks respondents a series of supplemental questions regarding annual income during the previous calendar year, as well as annual work experience, family structure, and other topics. These data provide the basis for the nation's official poverty estimates, among other statistics. The Census Bureau publicly releases a version of these data, along with sample weights, or adjustment factors, which make it possible for users to generalize from the survey sample (based on approximately 80,000 households) to the entire U.S. non-institutionalized population.

---

[2] These are Census Bureau "weighted average poverty thresholds" for 2004. In its actual family-by-family determinations of poverty status, the Census Bureau uses slight variations on these thresholds that vary by the detailed composition of each family. For example, a two-person family could have a poverty threshold ranging from $11,418 to $13,020 depending on whether one of the family members was a child and whether the head of household was at least 65 years old. For ease of presentation, the Census Bureau releases "weighted average" poverty thresholds, which represent the poverty line used for an "average" family of that size each year.

We used the 2003, 2004, and 2005 CPS ASEC public use files, which cover calendar years 2002, 2003, and 2004. We averaged together results from three years to improve the reliability of our data, following the guidelines recommended by the Census Bureau for situations where small sample size is a concern.[3]

This analysis includes all households in the CPS, including households headed by a single individual living alone, households headed by an individual living with non-relatives, and family households containing two or more persons related by birth, marriage, or adoption.

We identify telephone users using a CPS question that asks respondents, "Is there a telephone in this house/apartment?" The CPS uses information about telephones to determine whether it is appropriate to conduct follow-up interviews by telephone.

We identify elderly householders by whether the head of household was age 65 or older.[4]

We identify poverty status using the official poverty status of the head of household. The Census Bureau determines poverty status based on a comparison of the annual income of each family to the appropriate poverty threshold. For a single head of household living with no relatives, poverty status is thus determined by comparing the individual's income with the appropriate poverty threshold for a single individual. If the individual's annual income is below the poverty threshold, the Census Bureau considers the individual to be poor. If a head of household lives with one or more family members to whom he or she is related by birth, marriage, or adoption, the entire family's income is compared with the appropriate poverty threshold for the family, and everyone in the family is assigned the same poverty status.

The definition of income in these official poverty determinations is money income. Money income, often known as "cash income," includes: all income from wages, salaries, and net income (or losses) from self-employment; payments of public benefits such as Social Security, unemployment insurance, and cash public assistance or welfare; payments received from assets such as interest payments, stock dividends, rent received, royalties, and estates and trusts; and money received from other sources such as pensions, alimony, and child support.[5] It does not include the

---

[3] The Census Bureau "recommends the use of 3-year averages to compare estimates across states." See Source and Accuracy of Estimates for Income, Poverty, and Health Insurance Coverage in the United States: 2004, page 15. Available at www.census.gov/hhes/www/income/p60_229sa.pdf. Accessed 7/28/2006.

The Census Bureau itself has long published tables based on three-year averages of data. See for example, Table 10, "Percentage of People in Poverty by State Using 2- and 3-Year Averages: 2002 to 2004," in Carmen DeNavas-Walt, Bernadette D. Proctor, and Cheryl Hill Lee, *Income, Poverty, and Health Insurance Coverage in the United States: 2004* (Washington, DC: 2005), www.census.gov/prod/2005pubs/p60-229.pdf. Accessed 7/28/2006.

[4] The Census Bureau no longer uses the term "head of household." Before 1980, under Census procedures, the head of household in a married couple family was always considered to be the husband. Subsequently, the Census replaced this terminology with the gender-neutral concept of "householder." Either the husband or wife may be the householder in a married-couple family. We use the term head of household here because it is easily understood, but we are reflecting here the data for what the Census Bureau now calls "householders." In the CPS, every household has one, and only one, householder, and the number of householders equals the number of households. See U.S. Census Bureau, "Current Population Survey (CPS) - Definitions and Explanations," www.census.gov/population/www/cps/cpsdef.html. Accessed 7/28/2006.

[5] See U.S. Census Bureau, "Current Population Survey (CPS) - Definitions and Explanations," www.census.gov/population/www/cps/cpsdef.html. Accessed 7/28/2006.

4

value of non-cash benefits, such as food stamps. It also does not reflect capital gains or losses from the sale of assets such as stocks. Money income reflects pre-tax income prior to the subtraction of payroll deductions or union dues.

To identify income-tax non-filers, we used the Census Bureau's tax model. The Census Bureau does not ask households about their taxes in the CPS but simulates each CPS household's taxes on the basis of income, family composition, homeownership, and other considerations, and makes the results of its tax model available in the CPS public use data file. Tax filing units are not always the same as households or Census-defined families. As part of its tax model, the Census Bureau estimates who is likely to file federal income taxes if all household members follow Internal Revenue Service (IRS) rules, closely following IRS form 1040.[6] The Census Bureau describes its current procedures for determining federal income tax filing status as follows:

> "To determine who has a filing requirement, five conditions were evaluated:
>
> 1) Units with income exceeding the filing threshold for their filing status must file;
> 2) Units who do not meet the filing threshold but would receive an earned income credit must file;
> 3) Units with $400 or more of self-employment income must file;
> 4) Units with negative gross income must file; and
> 5) Units with negative reported (net) self-employed or farm self-employed income must file.
>
> ... Knowing that some people file though they are not required to, an exception was made to allow single and head of household returns with gross income over $3,000 to file.[7]

We define non-filer households here, based on the simulated tax filing status of the head of household, as determined by the Census Bureau's tax model. In the Census Bureau's tax model, more than one person in a household may be designated as a tax filer, and a non-filer head of household could share a household with someone else who is a tax filer. In the 2005 CPS ASEC data file, approximately 15 percent of non-filing heads of household shared a household with a tax filer.

In the current context, we focus on the simulated tax filing status of heads of household because heads of households are generally the persons in whose name the housing is rented or owned.[8] It thus is reasonable to assume that they are the individuals most directly responsible for paying telephone bills. This may be particularly true when tax filers who live with non-filing heads of

---

[6] See Amy O'Hara, "New Methods for Simulating CPS Taxes," (U.S. Census Bureau, 2004), www.census.gov/hhes/www/income/oharataxmodel.pdf. Accessed 7/28/2006.

[7] See Amy O'Hara, "New Methods for Simulating CPS Taxes," page 8.

[8] The Census Bureau explains, "The householder refers to the person (or one of the people) in whose name the housing unit is owned or rented (maintained) or, if there is no such person, any adult member, excluding roomers, boarders, or paid employees. If the house is owned or rented jointly by a married couple, the householder may be either the husband or the wife." It also may be noted that in cases where an individual who files a tax return resides in the same quarters as a head of household who is a non-filer, the filer and the non-filer cannot be a husband and wife. Under the Census Bureau's tax model, heads of households and their spouses always are assumed to file jointly. U.S. Census Bureau, "Current Population Survey (CPS) - Definitions and Explanations," www.census.gov/population/www/cps/cpsdef.html. Accessed 7/28/2006.

household are unrelated to the heads of household or are only temporarily sharing living quarters. Excluding non-relatives — i.e., people not related to the head of household by birth, marriage, or adoption — we estimate that about 11 percent of non-filer heads of household have other tax filers present in their home.

## II. HOW MANY OF THESE HOUSEHOLDS WOULD FILE A TAX RETURN TO OBTAIN THE EXCISE TAX CREDIT?

This raises the question: to what degree would these non-filer households alter their behavior and file a federal income tax return to receive an excise tax refund? Needless to say, there has been no test of such an approach, so the precise answer is not known. But there is a fair amount of information available with which to make an informed judgment on this matter, and the information all points to the same conclusion — the percentage of non-filer households with telephones that would file a tax return to receive this refund would be expected to be very low.

### A. The Kansas Experience

From 1986 until 1998, the state of Kansas offered certain low-income households a Food Sales Tax Refund — a rebate that was intended to alleviate the burden of that state's sales tax on groceries. The maximum credit amount in Kansas varied by family size; it equaled $130 for a family of four. The credit was available to households that had income of less than $13,000 and contained at least one child under the age of 18 or an elderly, blind, or disabled person.

To receive the Kansas credit, a family had to file a special form with the state — a form that it would not otherwise have had to file. We compared state participation levels in the Kansas credit for 1990, 1992 and 1994 with federal survey data on the number of households meeting the eligibility criteria. Our analysis found that in each of those years, *roughly two-thirds of eligible households* failed to claim the credit.[9]

The Kansas food tax refund program, as it existed in the 1990s, is relevant to the debate over the telephone excise tax refund for two reasons. The Kansas credit required the filing of a form that had no other purpose, much as the filing of a federal income tax form would have no purpose for non-filers other than to receive the excise tax refund. In addition, at a maximum amount of $130 for a family of four (roughly equivalent to $170 in today's dollars), the Kansas credit was worth as much or more than the suggested amounts for the telephone excise tax refund, suggesting that the incentive for households to participate was comparable or greater.[10]

---

[9] Nicholas Johnson and Iris J. Lav, *Should States Tax Food? Examining the Policy Issues and Options,* Center on Budget and Policy Priorities, 1998, p. 36.

[10] In 1998, partly in response to concerns about low participation rates, Kansas made several changes to the credit. The application form became part of the standard state income tax form. Income eligibility limits were significantly increased, as was the amount of the credit. As a result of those changes, the *number* of households receiving the credit increased several times over. It is unclear whether the participation *rate* has increased as well, but it is likely that any such increase would be attributable to the fact that the credit is now available to many families who would have had to file income tax returns anyway. See Kansas Legislator Briefing Book 2006, "Taxation, V-1, Low-Income Tax Relief," p. 3. Downloaded from http://skyways.lib.ks.us/ksleg/KLRD/Publications/2006Briefs/V-1LowIncomeTaxRelief.pdf.

## B. The Case of the Earned Income Tax Credit

The Earned Income Tax Credit is a significant federal tax benefit that is provided as a "refundable" tax credit. A refundable tax credit is a tax credit that an eligible tax filer receives regardless of whether he or she owes federal income tax.

A filer eligible for a $1,000 EITC who otherwise owes $300 in income tax would have his or her $300 tax liability eliminated and would receive a check from the Treasury for the remaining $700. A filer eligible for a $1,000 EITC who otherwise has no income tax liability because the filer's income is too low to owe income tax would receive a check for the full $1,000 of the credit. Substantial numbers of EITC recipients owe no income tax; they can file an income tax return and receive a check from the Treasury for the full amount of the EITC for which they qualify.

The EITC consists of two components with very different eligibility and benefit levels — the EITC for workers raising minor children in their home, and the EITC for workers who are *not* raising minor children in their home (which is often referred to as the childless workers' EITC). Under the EITC for filers raising children, a single worker who is raising one child and has adjusted gross income of up to $32,001 can receive an EITC worth up to $2,747 in tax year 2006. A single worker who is raising more than one child and has income up to $36,348 can receive an EITC worth up to $4,536. (Married workers with children remain eligible until their income reaches levels $2,000 above the levels at which single workers with children lose eligibility.)[11] The average EITC for workers with children exceeds $2,100.

The EITC for workers *not* raising minor children in their home is more focused on very-low-income workers and is much smaller. In 2006, a single worker not raising minor children who has adjusted gross income of less than $12,120 can claim an EITC worth up to $412. The worker must be between the ages of 25 and 64 to be eligible. Married couples who are not raising children and who have incomes of less than $14,120 also may claim an EITC of up to $412, as long as one of the spouses is within these age limits. The average EITC benefit for workers not raising children is about $210.

For purposes of this analysis of the degree to which non-filers would file a tax return to receive an excise tax refund, the EITC for childless workers is much more relevant. This is the case for several reasons. The large majority of workers with children who are eligible to claim the EITC are required to file a tax return anyway, and the EITC they receive generally dwarfs the proposed excise tax refund. In contrast, a much larger share of those who are eligible to claim the childless workers' EITC are *not* required to file a tax return and the tax credit for which they qualify is much smaller.

Specifically, the IRS filing threshold — the income level above which people are *required* to file — is $8,400 for single filers in 2006 and $16,900 for married couples. Many single filers without children who are eligible for the EITC, and all married couples without children who are eligible for the EITC, thus have no requirement to file.

---

[11] Internal Revenue Service, Internal Revenue Bulletin No. 2005-47, IRS Rev. Proc. 2005-70

In addition, workers claiming the childless workers' EITC may use Form 1040EZ. Workers claiming the larger EITC for filers raising children may not; they must use Form 1040 or 1040A. IRS Notice 2006-50 proposes to use a variant of the Form 1040EZ (a new Form 1040EZ-T), which the IRS would develop for non-filers to use in claiming the excise tax refund.

This raises the question of the degree to which people who are eligible for the EITC for childless workers fail to file a tax return.

## Non-filing by EITC-Eligible Households

An examination of non-filers in tax-year 1999, conducted by the Urban Institute-Brookings Institution Tax Policy Center, estimated that 60 percent of all non-filers not claimed as a dependent by another filer were single, non-dependent individuals without children and 25 percent were married couples without children.[12] More than half of the non-filers were elderly, but many low-income workers who had incomes too low to owe income tax also did not file a tax return even though they likely were eligible for the EITC.

In addition, and of particular significance, is a separate study conducted by the IRS in which the IRS examined returns for tax year 1996. The IRS found that between 2.3 and 3.4 million individuals were eligible for the EITC but did not file a tax return to claim it, forgoing $2.1 to $3.5 billion in EITC benefits.[13]

## Who are the EITC nonfilers?

The IRS study found that people who were eligible to claim the EITC but did not file were much more likely than people who filed and claimed the EITC to: 1) have incomes below the federal income tax filing requirement; and 2) be workers who were not raising children and consequently were eligible for the much smaller EITC for childless workers than the EITC for which filers with children qualify.

This leads to two straightforward conclusions: people who are *not* required to file a tax return are much less likely to file and to receive specific tax benefits for which they are eligible than people who are required to file; and people are much less likely to file in order to receive a small tax benefit than to file to receive a large tax benefit. The latter conclusion — that low-income households are less likely to incur the burdens of applying for a benefit when the benefit is smaller — is borne out by extensive research over several decades on participation rates in other means-tested programs, such as the Food Stamp Program.

A further examination of factors related to these two conclusions can help to shed further light on these matters and on their relevance to the question of the degree to which non-filers would file a tax return to receive an excise tax refund expected to be roughly in the $25-$50 range.

---

[12] Orszag and Hall, "Nonfilers and Filers with Modest Tax Liabilities," 100 Tax Notes 723, Tax Policy Center, August 4, 2003. This study examined all non-dependent non-filers, not just those who were eligible for the EITC.

[13] Internal Revenue Service, "Participation in the Earned Income Tax Credit Program for Tax Year 1996," Fiscal Year 2001 Research Project # 12.26, January 31, 2002

8

1. **Lack of awareness:** One factor likely to contribute to the higher rate of non-participation in the EITC among eligible individuals and couples who are *not required* to file is that some number of them are likely to be generally aware that they are not required to file but may be unaware that they qualify for the EITC and can actually receive a check from the Treasury if they do file. For nearly 20 years, the IRS and hundreds of public and private agencies, businesses, unions, churches, charities, and community organizations across the country have conducted extensive EITC outreach efforts to inform eligible low-income workers that they should file and claim the EITC. (For example, the Center on Budget and Policy Priorities produces more than 20,000 community outreach kits every year, as well as bilingual posters, and flyers, and conducts EITC outreach training sessions across the country; the Annie E. Casey Foundation funds EITC outreach efforts in a number of cities across the country; and the IRS conducts extensive EITC outreach efforts.) This is a difficult population to reach, however, and the number of households that are eligible for the EITC but do not file remains substantial.

2. **Benefits vs. Costs.** Some people who are eligible for the EITC but do not file may view the cost of filing a tax return as outweighing any benefits. One cost that workers may consider is how much commercial tax preparers will charge for preparing even a simple tax return. IRS data for tax year 2004 show that *more than 40 percent of workers who claimed the EITC on the simple Form 1040EZ sought third-party assistance in preparing and filing their return, mainly from commercial preparers.*[14] This finding is particularly relevant here, because of the IRS' plan to use a variant of the Form 1040EZ for non-filers who seek to apply for the excise tax refund.

   Workers who are raising children may *not* use the 1040EZ to claim the EITC. Hence, all EITC claims that are made by filers using the 1040EZ are made by people who are not raising children. Many of these workers may be motivated to file returns either to recover overwithheld income tax or because they are required to file; in other words, a desire to claim the EITC is not the only noteworthy factor. Those who are eligible for the EITC but do *not* file are less likely to have a requirement to file, and many of them earn incomes sufficiently low that *no* income taxes are likely to have been withheld, so there would not be any overwithheld income tax to recover. For a significant number of very-low-income workers who are eligible for the childless workers' EITC, the burden of filing — including the cost of going to a commercial preparer — apparently outweighs the perceived benefit of applying, which may be limited to receipt of the EITC.

   A review we conducted of over 20 commercial preparer websites posting fees in 2006 showed that fees for filing a 1040EZ range from $25 to $150, sometimes with additional charges for electronically submitting the return. Some nonfilers may have a perception of these fee levels and may chose to forgo filing even if they are aware they qualify for the childless workers' EITC.

   This problem would be magnified with the excise tax refund — at $25 to $50 (or some similar amount), that refund would be considerably *smaller* than the EITC for childless workers, which as noted, averages about $210. The excise tax refund might be little more than — or less than — the tax preparation fee. This suggests that the proposed use of a Form 1040EZ-T for non-

---

[14] Internal Revenue Service, "SPEC TY 2004 EITC Database," IRS, Wage & Investment, SPEC, Strategic Planning, January 31, 2006, unpublished data

filers to claim the excise tax refund would likely have only limited impact — for many, the "transaction costs" (i.e., the perceived burden of filing and the tax preparation fees) would likely outweigh the benefit from the excise tax refund.

**Can Free Tax Filing Assistance Address the Problem of Commercial Tax Preparation Fees?**

Some free tax preparation assistance is available to low-income households, but it is quite limited. Partly as a result, the number of EITC claimants seeking the assistance of commercial preparers has continued to increase, and the percentage of EITC filers who receive free tax assistance remains very small.

The IRS sponsors the "Free File Alliance," a consortium of 20 private companies that offer free on-line Internet federal tax return preparation to low- and moderate-income filers, senior citizens and members of the military. These services are accessed through a portal at the IRS website. Each company may establish which of these constituencies it wishes to offer free service to, and may establish income levels it will serve and which states it will serve. Four companies offer service to those earning between $10,000 and $50,000, so very low-income workers earning less than $10,000 have to shop around.

Services at the Free File Alliance are useful to workers who have computer access, are comfortable navigating computers, and wish to access the speed of electronic filing at no cost and obtain what might be called "assisted self-preparation" of their return. These services are not well suited, however, for workers who lack access to computers or are not adept at using them, who have low education and literacy levels, or who have low proficiency in English as their second language. For example, the filer needs to be able to answer questions from the tax software program to determine filing status and whether or not the filer has a qualifying child for purposes of claims for dependent exemptions, the EITC, and other tax credits.

In addition, the IRS Volunteer Return Preparation Program operates through the Tax Counseling for the Elderly Program (TCE), the Volunteer Income Tax Assistance (VITA) program, and the military component of the VITA program. The TCE program is operated primarily by AARP at volunteer sites throughout the country, and serves senior citizens as a priority but also can serve low-income workers who fall within EITC income eligibility guidelines. VITA operates through sites staffed by volunteers; it serves tax filers who are within the EITC income eligibility guidelines. Overall, these various types of services prepared 2.2 million returns in 2006, with the TCE program preparing 1.1 million returns, civilian VITA sites preparing about 770,000 returns, and the military VITA program (which operates through sites on military bases and posts) preparing 330,000 returns.[a]

There also are 400 IRS walk-in offices nationwide, many of which have traditionally offered free tax preparation services. In recent years, however, this function has been deemphasized to reduce the amount of staff time used to prepare tax returns. IRS offices will frequently refer walk-in customers seeking tax preparation help to the local VITA program. The walk-in offices prepared fewer than 50,000 returns claiming the EITC for 2004.

These free tax preparation resources are important. But together they reach only a very small percentage of low-income tax filers. They are not present in every community, and they have particularly limited availability in rural communities and in many communities serving immigrant workers. *While 70 percent of the more than 22 million EITC claims for 2004 were filed through commercial tax preparers, the free services prepared only two percent of EITC claims.*

Moreover, with the exception of a small annual appropriation of $4.5 million from Congress to the TCE program to cover expense and mileage reimbursements to senior volunteers and the limited commitment of IRS walk-in offices, there is no dedicated stream of funding for free tax filing services. *These services consequently have limited capacity to expand to serve a large number of individuals who would not file a tax return other than to claim the telephone excise tax refund.*

---

[a] Internal Revenue Service, "SPEC Returns Prepared," data provided by IRS Wage & Investment, SPEC, July 2006.

**3. Fear of the IRS.** Some workers who have not filed tax returns for several years may believe they owe back taxes to the IRS and may fear they will be subject to significant penalties if they surface by filing a return to claim any tax benefits — even if, in fact, they were *not* required to file and have not done anything wrong. Some workers have a generalized and mistaken fear of the consequences of

not having filed tax returns and may be unaware they were not required to do so. Moreover, some individuals are intimidated by the IRS and are afraid to get involved with it if they do not have to.

Further, the fact that a large number of EITC claimants without children choose to pay commercial preparer fees to file simple 1040EZ forms suggests that many low-income workers are intimidated by the process of filing a tax return itself and are fearful of doing so without professional assistance.

4. **Language and literary barriers.** The 1996 IRS study found that 24 percent of the people who were eligible for the EITC but did not file were Hispanic. Lower levels of literacy and/or education levels may contribute to some low-income workers feeling intimidated or confused by the tax-filing process. These filing barriers are likely to be stronger among non-English speaking and immigrant workers.

### Participation Rates Among People Eligible for the Childless Workers' EITC

The combined result of these various factors appears to be a low EITC participation rate among low-income workers who are eligible for the childless workers' EITC. A study by the General Accounting Office found that only about 44.7 percent of households eligible for the EITC for childless workers actually received it.[15] Those eligible for the childless workers' EITC who do not file a tax return lose the credit as a consequence.

The percentage of non-filers who would alter their behavior and file a tax return to receive the proposed excise tax refund would be expected to be considerably lower than the percentage of people eligible for the childless workers' EITC who file and claim it. This is the case for three basic reasons.

1. The average benefit that the childless workers' EITC provides is about four to eight times larger than the likely size of the excise tax refund.

2. The childless workers' EITC has been in place for many years, giving time for information and awareness of it to spread through word-of-mouth, ongoing outreach efforts, and the like. The excise tax refund, by contrast, would be a one-time only event.

3. A significant share of those eligible for the childless workers' EITC who claim it — single workers with incomes between $8,480 and $12,100 in 2006 — are people who are required to file a federal income tax return anyway.

### The San Francisco EITC

Another relevant piece of information comes from the local earned income tax credit that the city of San Francisco recently established for San Francisco residents who are raising children and who claim the federal EITC. To claim the San Francisco EITC, filers must send a separate application to the city. The application can, however, be prepared at the same time that a filer's federal and state tax returns are done, and major commercial tax preparers and community groups have participated with the San Francisco city government in heavily promoting the credit. The average benefit for tax year 2005 was $220.

---

[15] General Accounting Office, "Earned Income Tax Credit Participation," GAO-02-290R, p. 2, December 2001.

Despite the fact that the eligible filers consisted of households that already were filing a federal income tax return (and the extensive outreach that was conducted), a study conducted by researchers at the Brookings Institution found that only 45 percent of eligible households claimed the credit.[16] The participation rate in the proposed excise tax refund among non-filers would be expected to be much lower both because such households are *not* otherwise filing tax returns and because the average excise tax refund would be about one-ninth to one-fourth the size of the average San Francisco EITC.

## Observations Regarding the Percentage of Non-Filers Who Would File to Obtain an Excise Tax Refund

The data and various sources of information that shed light on the degree to which non-filers would file to obtain an excise tax refund are not encouraging.

- Only one-third of low-income households eligible for a Kansas sales tax rebate filed to get it. Moreover, that rebate likely was larger than the excise tax refund will be, and the one-third participation rate was measured after the credit had been in place for several years and thereby had an opportunity to become better known.

- Only about 45 percent of the low-income households eligible for the EITC for childless workers receive that credit. This percentage of people eligible for the childless workers' EITC who receive it is likely to be much higher than the percentage of non-filers with telephones who would file to obtain an excise tax refund for three reasons: 1) the childless workers' EITC provides a much larger benefit, on average; 2) a significant share of those who file for the childless workers' EITC are required to file anyway; and 3) the participation rate for the childless workers' EITC was measured after that credit had been in place for several years.

- 45 percent of the eligible low-income households received the new San Francisco EITC in 2005, even though the population of eligible households was limited to households that already file a federal tax return and the average tax benefit was $220, much larger than the likely excise tax refund. Here, too, the percentage of non-filers who would file a federal tax return to receive the excise tax refund would be expected to be much lower.

- Finally, and of considerable importance, some 40 percent of federal income tax filers who use the Form 1040EZ use a commercial preparer, and the fees charged for preparing that form range from $25 to $150. With the IRS planning to require people who otherwise do not file a tax return to file a form based on the 1040EZ (the 1040EZ-T) to obtain the excise tax refund, the tax preparation fees for those who would go to commercial preparers almost certainly would eat up much, all, or more than all of the excise tax refund.

Based on these data and findings, we conclude that the proportion of non-filers who would file to obtain an excise tax refund is likely to be below one-third, and possibly well below. Since there are an estimated 15 million non-filers with telephones, this conclusion suggests that 10 million or more

---

[16] Tim Flacke and Tiana Wertheim, "Delivering a Local EITC: Lessons from the San Francisco Working Families Credit," The Brookings Institution Metropolitan Policy Program, May 2006, p. 9.

such non-filers likely would fail to obtain the excise tax refund if the only way to obtain it is by filing a federal income tax return.

**Robert Greenstein**

Robert Greenstein is the founder and Executive Director of the Center on Budget and Policy Priorities, an independent non-profit organization established in 1981 to analyze federal and state budget and policy issues, with an emphasis on the effects of budgets, programs, and policies on low- and moderate-income Americans. In September 1998, a study issued by the Aspen Institute Non-profit Sector Research Fund (based on surveys of Members of Congress and senior Administration officials) identified the Center as the single most effective organization in Washington on federal budget policy. Earlier, *Washington Monthly* named the Center as one of the five best and most effective of 2,000 non-profit organizations in Washington.

In 1994, President Clinton appointed Mr. Greenstein to serve as a member of the Bipartisan Commission on Entitlement Reform. In 1996, Mr. Greenstein was awarded a MacArthur Fellowship. The MacArthur Foundation cited Mr. Greenstein for making the Center "a model for a non-partisan research and policy organization." The Foundation called the Center "an institution that combines rigorous analysis of public programs with a commitment to poor families. The Center's research is widely respected for its honesty and objectivity."

In 1979 and 1980, Mr. Greenstein served as Administrator of the Food and Nutrition Service of the U.S. Department of Agriculture. In that capacity, he had primary responsibility for the nation's food assistance programs, including the food stamp and school lunch programs, and oversaw 2,500 staff and an agency budget of $15 billion.

Mr. Greenstein has contributed articles to a number of publications, including the *New York Times, Washington Post, Los Angeles Times, The New Republic,* and *Tax Notes,* and to a number of books, such as the 1991 Brookings Institution volume, *The Urban Underclass,* and a later Brookings book, *The New World of Welfare.* He has been a guest on many network, cable, and local television and radio programs.

In 1991, Mr. Greenstein received one of the six 1991 Public Service Achievement Awards awarded by Common Cause. In 1992, he received an honorary Doctorate of Public Service from Tufts University, a distinguished service award from the American Association for Budget and Program Analysis, and a Prudential Foundation leadership award. In 1995, he was one of two recipients of the Center on Law and Social Policy's 25th Anniversary award. In 1999, he and Iris Lav, the Center's Deputy Director, jointly received the Steven D. Gold award, which is awarded by the Association for Public Policy Analysis and Management, the National Conference of State Legislatures, and the National Tax Association for work on state and local fiscal policy. In 2002, he was elected a Fellow of the American Academy of Arts and Sciences.

Mr. Greenstein received a bachelor's degree from Harvard University and has done graduate work at the University of California at Berkeley. He also holds an Honorary Doctorate from Tufts University, which he was awarded in 2002.

# ROBERT GREENSTEIN

| | |
|---|---|
| December 1981 to present | Executive Director<br>Center on Budget and Policy Priorities<br>820 First Street, N.E.<br>Washington, D.C. 20002<br><br>Founder and executive director of Center, which conducts research and analysis on federal and state policy issues relating to low- and moderate-income persons. |
| February 1981 to November 1981 | Director<br>Project on Food Assistance and Poverty<br>Washington, D.C.<br><br>Established and directed a 10-month project to produce analyses and reports on food assistance and related poverty issues. |
| January 1979 to January 1981 | Administrator<br>Food and Nutrition Service<br>U.S. Department of Agriculture<br>Washington, D.C.<br><br>Chief executive officer of federal agency responsible for administering all major domestic food assistance programs, including the food stamp program, school lunch and other child nutrition programs, and the Special Supplemental Food Program for Women, Infants and Children. Responsible for staff of 2,500 and annual budget of $15 billion. |
| March 1977 to January 1979 | Special Assistant to the Secretary of Agriculture<br>Office of the Secretary<br>U.S. Department of Agriculture<br>Washington, D.C.<br><br>Responsible for policy development relating to domestic food assistance programs. Responsible for developing Administration proposals for restructuring the food stamp program in 1977. Also represented USDA on inter-agency and White House task forces on welfare reform and dealt with OMB on behalf of USDA on domestic food assistance issues. |

1

July 1972 to  
February 1977

Project Director and Program Analyst  
Community Nutrition Institute  
Washington, D.C.

Conducted analyses of various food assistance issues, served as associate editor of weekly newsletter on food and nutrition issues affecting low- and moderate-income consumers, and administered federal grant to provide materials, training, and technical assistance to local anti-poverty agencies in the Mid-Atlantic region working in the food assistance area.

September 1969 to  
June 1972

Teacher  
Newton South High School  
Newton, Massachusetts

Taught history and social studies



## Education

- A.B., magna cum laude, Harvard College, 1967

- Also one year in direct Ph.D. program in American History at University of California, Berkeley, 1968-1969.

- Honorary Doctorate of Public Service, Tufts University, 1992.



## Honors

- Elected a Fellow of the American Academy of Arts and Sciences, 2002

- Steven Gold Award, 1999 (awarded by the Association for Public Policy Analysis and Management, the National Tax Association, and the National Conference of State Legislatures for work on state and local fiscal policy; co-beneficiary with Iris Lav, the Center's deputy director)

- MacArthur Fellowship, 1996

- Center for Law and Social Policy 25th Anniversary Award, 1995

- Honorary Doctorate of Public Service, Tufts University, 1992

- Distinguished Service Award, American Association for

Budget and Program Analysis, 1992

- Prudential Foundation Leadership Award, 1992

- Public Service Achievement Award, Common Cause, 1991

- Nat Weinberg Award for Research on Social Justice Issues, 1990

- Distinguished Service Award, U.S. Department of Agriculture, 1980

- Phi Beta Kappa, 1967

## ======Board Memberships ======
### Advisory Committees

- Bipartisan Commission on Entitlement Reform, by Presidential appointment, 1994

- Share Our Strength (current)

- National Academy of Social Insurance (past)

## ======Publications ======

- Work has appeared in various publications, including the *New York Times, Los Angeles Times, Washington Post, Boston Globe, New Republic, The Brookings Review, Tax Notes, The American Prospect, Communities & Banking* (a publication of the Federal Reserve Bank of Boston), other newspapers and magazines, and books published by The Brookings Institution, The Center for National Policy, and the National Conference on State Legislatures, among others.

- In addition, authored or co-authored various Center publications on a range of poverty issues, including issues relating to food assistance, welfare policy, low income housing, and federal and state tax policy affecting low income households.

## ======Reports, Analyses, Book Chapters, and Journal Articles ======
(partial list through 1998, has not been updated since, but there are more than 100 new papers since then, most accessible through the Center's website)

- *New Research Findings on the Effects of the Earned Income Tax Credit,* with Isaac Shapiro, Center on Budget and Policy Priorities, March 1998.

- *The Earned Income Tax Credit and Error Rates,* February 1998.

3

- *Trends in the Distribution of After-Tax Income: An Analysis of Congressional Budget Office Data,* with Isaac Shapiro, Center on Budget and Policy Priorities, August 1997.

- *Do Criticisms of the Treasury Department's Distributional Analyses Have Merit? Why Treasury and Joint Tax Committee Analyses Differ,* with Iris J. Lav, Center on Budget and Policy Priorities, July 1997.

- *What is the WIC Full Funding Level?,* with Jennifer Daskal and Edward Lazere, Center on Budget and Policy Priorities, April 1997.

- *The Administration's Budget Proposals for WIC,* March 1997.

- *The Budgetary Context for Changes in Safety Net Programs,* June 1996.

- *The Earned Income Tax Credit: A Target for Budget Cuts?,* June 1995.

- *The Child Nutrition Block Grants,* with David Super, Center on Budget and Policy Priorities, April 1995.

- *Welfare, Out-of-Wedlock Childbearing, and Poverty: What is the Connection?,* with Sharon Parrott, Center on Budget and Policy Priorities, January 1995.

- *Warning: Inadequate Low Income Subsidy Design Can Cause Problems for Health Care Reform,* with David Super and Laura Summer, Center on Budget and Policy Priorities, July 1994.

- *The Status of the School Lunch Program: Is the Program in Jeopardy?,* May 1994.

- *Universal School Lunch: A Timely Idea?,* May 1994.

- *Financing Welfare Reform: Should Housing Subsidies Be Counted as Income in the Food Stamp Program?,* February 1994.

- *The Balanced Budget Constitutional Amendment,* with Paul Leonard, Center on Budget and Policy Priorities, September 1993.

- *Making Work Pay: The Unfinished Agenda,* with Isaac Shapiro, Center on Budget and Policy Priorities, May 1993.

- *The States and the Poor: How Budget Decisions Affected Low Income People in 1992,* with Iris Lav, Stephen D. Gold, and Edward Lazere, Center on Budget and Policy Priorities and Center for the Study of the States, February 1993.

- *Offsetting the Effects of Regressive Tax Increases on Low- and Moderate-Income Households*, with Frederick C. Hutchinson, Center on Budget and Policy Priorities, January 1993.

- "Reducing Poverty" in Mark Green, ed., *Changing America: Blueprints for the New Administration*, 1992.

- "Policies to Alleviate Rural Poverty," with Isaac Shapiro, in Cynthia M. Duncan, ed., *Rural Poverty in America*, Auburn House, 1992.

- *A Hand Up: How State Earned Income Credits Help Working Families Escape Poverty*, with Frederick C. Hutchinson and Iris J. Lav, Center on Budget and Policy Priorities, April 1992.

- "The Center on Budget and Policy Priorities," with Isaac Shapiro and Kathryn A. Porter, in Carol H. Weiss, ed., *Organizations for Policy Analysis: Helping Government Think*, Sage Publications, 1992.

- *The States and the Poor: How Budget Decisions in 1991 Affected Low-Income People*, with Isaac Shapiro, Steven D. Gold, Mark Sheft, Julie Strawn, and Laura Summer, Center on Budget and Policy Priorities and Center for the Study of the States, December 1991.

- "The Kindest Cut," *The American Prospect*, Fall 1991.

- *Selective Prosperity: Growing Income Disparities Since 1977*, with Isaac Shapiro, Center on Budget and Policy Priorities, July 1991.

- "Relieving Poverty: An Alternative View," *The Brookings Review*, Summer 1991.

- "Universal and Targeted Approaches to Relieving Poverty," in Christopher Jencks and Paul Peterson, *The Urban Underclass*, Brookings Institution, 1991.

- *One Step Forward: The Deficit Reduction Package of 1990*, with Paul Leonard, Center on Budget and Policy Priorities, November 1990.

- *Tailor Made: The Earned Income Tax Credit and Hispanic Working Poor Families*, with Isaac Shapiro, Center on Budget and Policy Priorities, September 1990.

- *Fulfilling Work's Promise: Policies to Increase Incomes of the Rural Working Poor*, with Isaac Shapiro, Center on Budget and Policy Priorities, February 1990.

- "Relieving Poverty: Welfare and Non-Welfare Approaches" in Mark Green and Mark Pinsky, eds., *America's Transition: Blueprints for the 1990s*, Democracy Project, January 1989.

- *Shortchanged: Recent Developments in Hispanic Poverty, Income and Employment*, with Kathy Porter, Isaac Shapiro, Paul Leonard, and Scott Barancik, Center on Budget and Policy Priorities, October 1988.

- "State Tax Relief for Low-Income People," with Frederick Hutchinson, in Steven D. Gold, ed., *The Unfinished Agenda for State Tax Reform*, National Conference of State Legislatures, November 1988.

- *Saving to Serve More: Ways to Reduce WIC Infant Formula Costs*, with Stefan Harvey and Scott Barancik, Center on Budget and Policy Priorities, September 1988.

- "Prisoners of the Economy" (review of William Julius Wilson's *The Truly Disadvantaged*), *New York Times Book Review*, October 25, 1987.

- *Food Stamp Employment and Training Resource Guide,* with Kathryn Porter, Judith Gueron, Robert Lerman, Alan Werner, Patricia Auspos, and Kay Sherwood, Center on Budget and Policy Priorities, September 1986.

- "Losing Faith in 'Losing Ground'" (a critique of Charles Murray's *Losing Ground*), *The New Republic*, March 1985.

### ═══Testimony and Appearances ═══

- Approximately 150 pieces of Congressional testimony since 1976, covering poverty issues, budget issues, food stamp, school lunch, and WIC program issues, tax policy, welfare reform, unemployment, and the minimum wage, among other issues.

- Presentations before various research conferences, such as the Association for Public Policy Analysis and Management, the Eastern Sociological Association, and the Aspen Institute Rural Economic Policy Program.